**In re ALLEGHENY INTERNATIONAL, INC., et al., Debtors.**

**AL TECH SPECIALTY STEEL CORPORATION, Plaintiff,**

v.

**ALLEGHENY INTERNATIONAL, INC., et al., Defendant.**

**Bankruptcy No. 88–00448.**
**Obj. No. 89–0009.**

United States Bankruptcy Court,
W.D. Pennsylvania.

July 30, 1993.

See also 158 B.R. 332, 158 B.R. 343, 158 B.R. 356.

William L. Gardner, Kenneth A. Rubin, Anthony C. Roth, Morgan, Lewis & Bockius, Washington, DC, George L. Cass, Buchanan Ingersoll, P.C., Pittsburgh, PA, for debtors.

David K. Floyd, David P. Flynn, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY, H. Brian Peck, Rothman Gordon, Pittsburgh, PA, for AL Tech.

### MEMORANDUM OPINION

JOSEPH L. COSETTI, Chief Judge.

|      |                            | Page No. |
| ---- | -------------------------- | -------- |
| I.   | CASE HISTORY               | 363      |
| II.  | FACTUAL SUMMARY            | 364      |
|      | A. The District Court's Decision | 365 |
| III. | DISCUSSION                 | 366      |
|      | A. Parties' Contentions    | 366      |
|      | B. Burden of Proof         | 367      |

Page No.
C. Remediation: The New York Oil Spill Act ........................... 368
    1. Private Right of Action ....................................... 368
    2. Statute of Limitations ........................................ 370
D. Remediation: CERCLA and RCRA ................................. 371
E. Steel Plant Facilities: Estimation ................................... 372
    1. Willowbrook Pond ........................................... 373
    2. Brigham Road Plant Waste Acid Pit ........................... 374
    3. Lucas Avenue East Waste Acid Pits .......................... 375
    4. Lucas Avenue West Pickle House ............................. 375
    5. Watervliet Waste Acid Pits .................................. 376
    6. South Lagoon ............................................... 377
    7. Oil Contamination Area ...................................... 377
    8. Watervliet Solid Waste Landfill .............................. 378
    9. PCB Contamination ......................................... 379
    10. Pump House and Aboveground Fuel Oil Tank ................... 379
    11. Underground Fuel Tanks ..................................... 380
    12. Kromma Kill ............................................... 380
    13. Melt Shop ................................................. 380
    14. Estimated Cost Summary .................................... 381
F. Equitable Allocation ............................................. 381
IV. CONCLUSION ................................................... 384

## I. CASE HISTORY

This dispute revolves around a claim AL Tech Specialty Steel Corporation ("AL Tech") filed against Allegheny International, Inc. ("AI") to recover response costs related to various hazardous waste sites.[1] On January 12, 1990, AI moved for summary judgment and for disallowance of AL Tech's claim. On January 22, 1990, AL Tech filed a cross-motion for "pass-through" treatment contending that a portion of its claim was not dischargeable in the bankruptcy plan because it did not arise prior to the bankruptcy.

On April 30, 1990, by an Order and Memorandum Opinion, this court granted AI's motion for summary judgment, denied AL Tech's cross-motion for "pass-through" treatment, and disallowed AL Tech's claim under 11 U.S.C. § 502(e)(1)(B). In addition, this court held that the non-assignment clause of the original sale agreement prohibited AL Tech from asserting the indemnity provision of the sale agreement between it and AI.

This was appealed and on May 6, 1991, the District Court for the Western District of Pennsylvania issued a Memorandum Opinion and Order affirming in part and reversing in part. *In re Allegheny Int'l, Inc.*, 126 B.R. 919, 922, 926 (W.D.Pa.1991). The district court affirmed this court's holding regarding the indemnity provision of the sale agreement, and reversed and remanded AL Tech's statutory contribution claims for further findings of fact and for an estimation of AL Tech's pre-petition contribution claims under CERCLA and the New York Oil Spill Act.

On November 29, 1991, the Court of Appeals for the Third Circuit entered a judgment order affirming the district court. *Allegheny Int'l, Inc. v. AL Tech Specialty Steel Corp.*, 950 F.2d 721 (3d Cir.1991), *affirmed without opinion.*

On remand in the bankruptcy court, AI moved for summary judgment as to each of AL Tech's claims and renewed its motion for summary judgment pursuant to 11 U.S.C. § 502(e)(1)(B). On September 17, 1992, AI's motions for summary judgment were denied. On or about September 30, 1992, AL Tech withdrew its claims alleging post-petition and "pass-through" treatment of its claims.

---

1. Courts have defined response costs as those costs incurred in performing a specified removal or remedial action. *See, T & E Indus. v. Safety Light Corp.*, 680 F.Supp. 696 (D.N.J.1988).

In November and December, 1992, a trial in accordance with the district court's order was conducted. The parties presented expert testimony on the amount of incurred costs by AL Tech and when they were incurred. Expert testimony also estimated the total expected response costs under the appropriate regulatory statutes, and which party had the responsibility for paying such costs.

## II. *FACTUAL SUMMARY*

Between 1937 and 1976, Allegheny Ludlum Industries, Inc. ("Allegheny Ludlum"), the predecessor of AI, owned and operated a steel plant in Dunkirk, New York and in Watervliet, New York. On August 2, 1976, Allegheny Ludlum sold its steel plants to AL Tech.[2] The purchase agreement between Allegheny Ludlum and AL Tech was dated July 7, 1976 (the "1976 sale agreement").

AL Tech's two steel plants have been sold and purchased three times since AI last owned them in 1976. On April 29, 1981, the first sale of AL Tech was to GATX Corporation ("GATX") pursuant to an agreement and plan of merger dated March 16, 1981. GATX paid approximately $24.7 million for the AL Tech steel plants.

In June, 1986, Rio Algom, Inc. and Rio Algom Limited (collectively "Rio Algom") considered purchasing AL Tech. As a result, Rio Algom retained Arthur D. Little to perform environmental audits of the two Al Tech steel plants with special emphasis on certain facilities. A report by Arthur D. Little identified many of the environmental problems facing AL Tech, and it concluded that there were known problems which could result in millions of dollars of capital expenditures.

On June 30, 1986, the second sale of AL Tech took place when GATX sold the steel plants to Rio Algom pursuant to a stock

purchase agreement. Rio Algom purchased AL Tech from GATX for one dollar ($1).

In 1988, Rio Algom decided to sell AL Tech. As part of the "information package" provided to prospective buyers, Rio Algom prepared a "Schedule 14" which identified AL Tech's "Current Major Environmental Liabilities" and estimated them at $16.9 million. The schedule also identified AL Tech's "Pending Major Environmental Liabilities" and estimated them at $3 million. Also provided was a "wild guess" that plant-wide decontamination would cost in excess of $100 million, if the steel plants were closed.

Rio Algom commissioned two environmental audits to quantify AL Tech's environmental liabilities. One report by Fred C. Hart Associates, Inc. estimated that the environmental remediation costs at the Watervliet plant would be between $15–$18 million, depending upon whether the plant was closed or upgraded to bring it into regulatory compliance. The second report by Ecology and Environment, Inc. contained similar results, with estimated remediation costing between $14.4–$21.35 million.

On May 11, 1989, AL Tech was sold for the third time. Pursuant to a stock purchase agreement between Rio Algom, AL Tech, and Sammi Steel Company, Limited ("Sammi"), Sammi purchased the AL Tech steel plants from Rio Algom for $100,000. According to AL Tech's chief financial officer, Sammi reached its $100,000 offering price by reducing "dollar-for-dollar" AL Tech's anticipated environmental compliance and remediation costs. The $100,000 purchase price was also subject to an adjustment based upon AL Tech's "Modified Net Income (Loss)" during the first seven months of 1989.[3]

---

**2.** AL Tech was a corporation formed in 1976 by 33 management-level employees at the steel plants.

**3.** Contemporaneous with the transfer of ownership, AL Tech and Sammi "accrued" on the books more than $22 million for expected future environmental expenses. These accrued

environmental expenses were charged against the cost of goods sold during the first seven months of 1989 and created a material modified net loss. After litigation and arbitration over the propriety of accruing $22 million for expected future environmental liabilities, Rio Algom, *the seller,* is required to pay Sammi, *the buyer,* $6.5 million to "buy" the AL Tech steel plants.

Prior to the 1989 sale, AL Tech and Rio Algom provided Sammi with numerous documents concerning environmental compliance and contamination of the steel plants. This included the two environmental audits of the plants done for Rio Algom in 1988 and 1989, a five-year environmental expenditure plan, and a "Schedule 14." [4]

On May 26, 1988, AL Tech filed a timely proof of claim against AI. This claim alleged that AI was liable to AL Tech for a share of the incurred, contingent and unliquidated response costs required to remediate hazardous wastes located at the two steel plants. AL Tech's original estimated claim for already incurred and projected response costs was for the amount of $27,824,946. AL Tech subsequently amended its proof of claim to the amount of $22,367,463, which it alleges is the portion of the total estimated response costs of $34,754,691 that AI is responsible for paying.

AL Tech's claims against AI are based upon the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")[5] as amended by the Superfund Amendments and Reauthorization Act of 1986 and the New York Oil Spill Prevention, Control and Compensation Act ("Oil Spill Act")[6].

## A. The District Court's Decision

This court is bound to follow the district court's appellate decision and will do so accordingly.

On appeal, AL Tech argued that this court erred in determining that AL Tech's claims for contribution pursuant to CERCLA and the Oil Spill Act were contingent and therefore disallowed by 11 U.S.C. § 502(e)(1)(B). Section 502(e)(1)(B) states as follows:

> **(e)(1)** Notwithstanding subsection (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured, the claim of a creditor, to the extent that—
>
> > (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution;

This court held in its April 1990 Memorandum Opinion that § 502(e)(1)(B) permits disallowance when the claim is 1) for reimbursement or contribution, 2) where the claimant is liable with the debtor on the claim, and 3) where the claim is contingent at the time of its allowance or disallowance. *In re Allegheny Int'l, Inc.*, 126 B.R. at 921 (citations omitted). The district court's appellate opinion focused on the second factor: whether AL Tech was liable with AI on the claim of another creditor. AL Tech maintained that the claim it asserted against AI was a "direct claim" which did not involve another co-liability to another creditor. In contrast, AI argued that AL Tech's claim involved the Environmental Protection Agency ("EPA") and the New York Department of Environmental Conservation ("NYDEC") as co-creditors to whom AL Tech was liable with AI. *Id.*

---

**4.** At Rio Algom's request, AL Tech's Director of Environmental Affairs, Frank J. Boinski, and AL Tech's outside counsel, Phillips, Lytle, et al., prepared Schedule 14 for Rio Algom to give prospective purchasers of AL Tech. Mr. Boinski personally gave Schedule 14 to prospective purchasers who toured the steel plants. Schedule 14 was intended to present an accurate picture of AL Tech's environmental liabilities and problems, and it identified more than $12.7 million in costs associated with cleaning up the contamination. It also estimated that approximately $100 million would be required for a "plant wide" decontamination if the plants were closed.

The 1988 and 1989 environmental audits identified required environmental remediation and regulatory compliance for the plants, and estimated the cost of such remediation and compliance at between $29.4 and $39.3 million. The five-year environmental plan showed that AL Tech projected that it would spend $22 million on environmental problems between 1989 and 1993.

Finally, prior to the sale, Sammi had its own environmental audits performed by IT Corporation.

**5.** 42 U.S.C. §§ 9601 *et seq.* (1980) (West Suppl. 1992).

**6.** N.Y. Navigation Law §§ 170 *et seq.* (McKinney's Cons.Laws, West 1989 and Suppl.1993).

The district court applied a three step analysis. First, the district court reviewed the history and the express language of 11 U.S.C. § 502(e)(1)(B) and held that the statute did not intend to exclude direct contingent claims, but only to exclude those claims where the claimant and the debtor are jointly liable to a third party. *Id.* at 922. The district court also relied upon 11 U.S.C. § 502(c) to support its holding. Section 502(c) provides an express method for treating direct contingent claims by estimation. Section 502(c) states as follows:

(c) There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claims, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case;

11 U.S.C. § 502(c).

The district court reviewed whether the substantive law recognized a direct claim by one potentially responsible party ("PRP") against another. The district court analyzed AL Tech's CERCLA claim under 42 U.S.C. § 9607(a)(4)(B), and held that this section created a private cause of action and that AL Tech's claim for response costs was not excluded by § 502(e)(1)(B).[7] *In re Allegheny Int'l,* 126 B.R. at 923.

The district court had to decide whether AL Tech's claim was a direct claim or instead a claim based upon joint or secondary liability. The district court did not believe that AL Tech sought to recover response costs owed to or incurred by the EPA, the NYDEC, or any other third party, but rather sought to recover response costs AL Tech had already incurred and would *directly* incur in the future. *Id.* Moreover,

the district court held that AL Tech was not liable with AI to any creditors for such response costs, thus making these costs fall outside of the scope of § 502(e)(1)(B). *Id.* at 924. The court concluded that AL Tech's claim under CERCLA was not disallowed by § 502(e)(1)(B).[8]

This court, in its April, 1990 Memorandum Opinion, expressed concern over the danger that such claims could raise the possibility of double liability; a danger § 502(e)(1)(B) was designed to prevent.[9] Conceivably, AL Tech could achieve an allowance of its claim, be paid by AI, and then fail to satisfy the clean up required by the authorities. Pursuant to CERCLA, the authorities would then be able to seek compensation for the remediation of the sites by AI.[10]

The district court suggested that this court could prevent such an inequity by using its equitable powers to create an appropriate trust which would prevent double recovery. *Id.* The district court acting on appeal suggested that such a trust would be an effective means of guaranteeing that distributions on AL Tech's claim be used exclusively to remediate the waste sites and would eliminate the potential for double recovery from AI for such remediation. *Id.*

Therefore, on remand, this court must estimate the total costs of remediation for the two steel plants and determine whether AL Tech's claim against AI for contribution of such costs is allowed. 11 U.S.C. § 502.

## III. DISCUSSION

### A. Parties' Contentions

AI's first argument is that AL Tech's claims must be disallowed in their entirely

---

7. The effect of § 502(e)(1)(B) on AL Tech's Oil Spill Act claim was not addressed by this court in its 1990 Memorandum Opinion. This issue will be discussed in this Memorandum Opinion *infra.*

8. *Accord, In re Dant & Russell, Inc.,* 951 F.2d 246, 248–49 (9th Cir.1991) (11 U.S.C. § 502(e)(1)(B) does not apply to disallow PRP's claim for cost of future cleanup that was not ordered by the EPA).

9. See also, *In re Cottonwood Canyon Land Co.,* 146 B.R..992, 996 (Bankr.D.Colo.1992). In *In re*

*Cottonwood,* the bankruptcy court differed with the district court's analysis which recommended the use of a trust to satisfy any remediation obligation because such a trust mechanism for payment illustrated that both AI and AL Tech were liable to the EPA and the DEC for the cost of remediation.

10. It is the court's understanding of the record that both the NYDEC and the EPA were notified of the bankruptcy but did not file claims.

because they fail to establish an allowable claim. More specifically, AI asserts that AL Tech's contingent contribution claims are barred by 11 U.S.C. § 502(e)(1)(B) because they are based on co-liability to an AI creditor. This court originally agreed with AI; however, this very holding was reversed by the district court.

■ AI noted in its briefs that although the district court declined to hold § 502(e)(1)(B) applicable, this court should reconsider this issue in the light of two recent decisions since the district court rendered its decision. The decisions are: *In re Cottonwood Canyon Land Co.*, 146 B.R. 992 (Bankr.D.Colo.1992) and *In re Eagle–Picher Indus., Inc.*, 144 B.R. 765 (Bankr. S.D.Ohio 1992).

Although these two cases regard the application of 11 U.S.C. § 502(e)(1)(B) and they have been decided since the district and Third Circuit rendered their decisions in this case, the law of the case doctrine created by these appellate courts restrains this court from reconsidering this issue. AI argues that the district court's decision is not binding on this court because the Third Circuit merely issued a judgment order with no accompanying written opinion or specific reference to the district court's opinion. This court believes that the law of the case has been established by the appellate court which is binding. Therefore, *In re Cottonwood* and *In re Eagle–Picher* will not be followed unless the appellate courts so instruct.

■ AI's next argument is that AL Tech is not entitled to § 502(c)(1) estimation because it did not remove contingencies within its control. To the contrary, AL Tech asserts that estimation under 11 U.S.C. § 502(c) is appropriate as a matter of law and that such remediation should be estimated by this court to cost $34,754,691.00.

The cases cited by AI to support its argument that a claimant in bankruptcy must eliminate contingencies within its control in order to be entitled to § 502(c)(1) estimation can all be distinguished.[11] Furthermore, the provisions of the Bankruptcy Code cannot stand as the sole relevant statutory guide, but must be reconciled with the provisions of CERCLA. "The question is what interaction between the two statutes serves most faithfully the policy objectives embodied in the two separate enactments of Congress." *In re National Gypsum Co.*, 139 B.R. 397, 404 (N.D.Tex.1992). This court does not believe the law dictates that contingencies within the control of the claimant must *absolutely* be removed. Basic equitable policies concerning bankruptcy do require that claimants mitigate their damages. AL Tech had begun the remediation process by the time AI filed for bankruptcy protection—albeit a very slow start. Remediation studies were conducted and money was budgeted to finance the remediation. However, since 1988, when the remediation was commenced, environmental liabilities have continued to grow.

AI's next argument maintains that the costs AL Tech seeks to recover are grossly inflated and speculative. AL Tech argues that all of its proposed remediation is necessary and reasonable for the purposes of CERCLA and the Oil Spill Act, and consistent with the National Contingency Plan. This court will address AI's allegations with regarding each site later in this Memorandum Opinion.

Finally, AI argues that the equitable factors in this case require this court to estimate AL Tech's claims at zero. AL Tech on the other hand believes that this court's allocation analysis should focus on the years of ownership and operation, and that based on this, AI is responsible for 64% of the total estimated response costs. The equitable allocation of the estimated response costs will be addressed later in this Memorandum Opinion.

### B. *Burden of Proof*

■ AL Tech bears the burden of proving its claims by a preponderance of the evidence. *In re Allegheny International, Inc.*, 954 F.2d 167, 173–174 (3d Cir.1992)

---

11. *Kessler v. Jefferson Storage Corp.*, 125 F.2d 108 (6th Cir.1941); *In re KDI Corp.*, 119 B.R. 594 (S.D.Ohio 1990); and *In re Hot Springs Broadcasting, Inc.*, 210 F.Supp. 533 (W.D.Ark.1962).

("[T]he burden of persuasion is always on the claimant" and "the claimant must prove the validity of the claim by a preponderance of the evidence.").

## C. *Remediation: The New York Oil Spill Act*

### 1. *Private Right of Action*

CERCLA's definition of hazardous substance does not include virgin petroleum oil unless it has been contaminated by an otherwise specifically listed or designated hazardous substance. 42 U.S.C. § 9601(14).[12] Therefore, unless petroleum is contaminated with some other hazardous substance found in petroleum, no liability under CERCLA will attach.

Some contamination at the AL Tech steel plants is from virgin and unused petroleum products. Because this contamination is outside the scope of CERCLA, AL Tech also bases its claim for contribution of response costs on New York's Oil Spill Act, Article 12 of the New York Navigation Law, which does include petroleum oil contamination.

AL Tech's petroleum contamination claims are related to a 300,000 gallon fuel tank and pump house, an oil contamination area, the Kromma Kill, and underground fuel tanks. These items constitute over $4.5 million of the total amount claimed for response costs and more than $3.5 million of the monies AL Tech seeks from AI.

AL Tech asserts that § 181 of the Oil Spill Act explicitly provides a private cause of action whereby parties incurring response costs with respect to oil spills can recover all or part of those costs from any "responsible party." Section 181(3) of the Oil Spill Act makes the owner or operator of a major facility strictly liable "... for all cleanup and removal costs and all direct and indirect damages paid by the fund."

N.Y.Nav.Law § 181(3) (McKinney 1989). It is undisputed that AL Tech is a major facility as defined in the Oil Spill Act. N.Y.Nav.Law § 172(11). In addition, § 181(1) provides that "[a]ny person who has discharged petroleum shall be strictly liable ... for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained...." N.Y.Nav. Law § 181(1) (McKinney 1992).

Section 181(5) provides, "[a]ny claim by any injured person for the costs of cleanup and removal and direct and indirect damages based on the strict liability imposed by this section may be brought directly against the person who has discharged the petroleum...." N.Y.Nav.Law § 181(5) (McKinney 1991); *See, Snyder v. Jessie,* 164 A.D.2d 405, 565 N.Y.S.2d 924, 926–28 (1990), *appeal dismissed without op., Snyder v. Jessie,* 77 N.Y.2d 940, 569 N.Y.S.2d 613, 572 N.E.2d 54 (1991). In addition, § 176(8) of the Oil Spill Act provides in pertinent part:

> Notwithstanding any other provision of law to the contrary ... every person providing cleanup, removal of discharge of petroleum or relocation of persons pursuant to this section shall be entitled to contribution from any other responsible party.

N.Y.Nav.Law § 176(8) (McKinney 1989). "Cleanup and removal costs" is defined to mean "... all costs associated with the cleanup and removal of a discharge ... incurred by the state or its political subdivisions or their agents or any person with approval of the department." N.Y.Nav. Law § 172(5) (McKinney 1989). Section 173 provides that "[t]he discharge of petroleum is prohibited." N.Y.Nav.Law § 173. "Discharge" is defined to mean "... any intentional or unintentional action or omission resulting in the releasing ... of petro-

---

**12.** The courts and the EPA are in general agreement that the petroleum exclusion applies, in addition to crude oil and virgin petroleum products, to those petroleum products which may contain indigenous hazardous substances or hazardous substances added during the refining process. Where hazardous substances are present in a petroleum product in excess of those concentrations found normally or routinely added as a result of the refining process, however, the exclusion does not apply. *See, e.g., U.S. v. Alcan Aluminum Corp.,* 964 F.2d 252, 266–67 (3d Cir.1992); *Westwood Assoc. v. Atlantic Richfield Co.,* 881 F.2d 801, 810 (9th Cir.1989); *Southern Pacific Transp. Co. v. California,* 790 F.Supp. 983 (C.D.Cal.1991); *New York v. Exxon Corp.,* 766 F.Supp. 177 (S.D.N.Y.1991).

leum into the waters of the state ..."
N.Y.Nav.Law § 172(8).

Al Tech contends that AI is liable to it for contribution under §§ 181(5) and 176(8) of the Oil Spill Act for certain costs Al Tech has and will incur for the environmental investigation and remediation of certain facilities located at Al Tech's two steel plants. Al Tech asserts that petroleum has been discharged into the waters located at certain facilities during the period that AI owned and operated those facilities, and that such discharge has or will cause Al Tech to incur cleanup and removal costs.

AI argues that it is liable under the Oil Spill Act only if, among other things, AL Tech proves that: 1) there has been a "discharge" of petroleum; 2) the discharge occurred during the years that AI owned the AL Tech steel plants; 3) the "costs of cleanup and removal" are "reasonable;" and 4) the cleanup and removal is, "to the greatest extent possible, in accordance with the National Contingency Plan." AI also maintains that while the Oil Spill Act allows an injured person to proceed either against the New York Environmental Protection and Spill Compensation Fund ("Fund") or to pursue a statutory or common-law action, the Oil Spill Act does not provide a private cause of action. *State v. King Service, Inc.*, 167 A.D.2d 777, 563 N.Y.S.2d 331, 332–333 (3d Dep't 1990). Further, AI argues that § 181(1), which provides that persons who discharge petroleum are strictly liable for all damages caused by the discharge, is intended only to provide "an administrative remedy in lieu of ... existing common-law and statutory remedies." *Snyder v. Jessie*, 164 A.D.2d 405, 565 N.Y.S.2d 924, 927 (4th Dep't 1990); N.Y.Nav.Law § 181(1).

AI also contends that § 176(8) authorizes very few actions of any kind and none under the facts of this case because § 176 provides only that a discharger "shall immediately undertake to contain" the discharge, that DEC "shall respond promptly and proceed to cleanup and remove the discharge," that DEC may act through contractors, and that "a person threatened by such discharges" may engage in cleanup and removal activities so long as it "obtains approvals" for its actions from appropriate state and federal agencies. N.Y.Nav. § 176 (McKinney 1989). AI believes that AL Tech's Oil Spill Act claim does not fall within the confines of § 176.

Finally, AI argues that AL Tech's action against AI is not a "claim" within the meaning of the Oil Spill Act because it is not a "claim of the fund or any claim filed with the administrator by a person, who is not responsible for the discharge...." N.Y.Nav.Law § 172(3) (McKinney Supp. 1992).

■ This court held in its April 30, 1990 Memorandum Opinion that the Oil Spill Act permits private recovery actions if the responding party can establish a discharge of petroleum that resulted in cleanup and removal efforts. *In re Allegheny Int'l Inc.*, slip op. 12–13. This determination was not challenged by AI on appeal; however, AI raises this issue on remand. The district court noted in a footnote that another state court decision on point has been issued. *In re Allegheny Int'l, Inc.*, 126 B.R. 919, 922 at n. 2. (citing, *Snyder v. Jessie*, 164 A.D.2d 405, 565 N.Y.S.2d 924, 926–287 (1990)).[13] AI asserts that by mentioning the *Snyder* case, the district court believes that this court's reliance on a different case must be re-evaluated. This court disagrees. The district court's brief reference to *Snyder* in a footnote does not constitute an instruction to this court to re-evaluate the decision. In point, the district court specifically remanded for consideration by this court "the effect of Section 502(e)(1)(B) on AL Tech's Oil Spill Act claim." *Id.*, at 922. Therefore, this court's earlier determination regarding AL Tech's private right of action under the Oil Spill Act is not changed.

---

**13.** The *Snyder* decision suggested that § 181(1) of the Oil Spill Act is intended only to provide "an administrative remedy in lieu of ... existing common-law and statutory remedies." *Snyder,* 565 N.Y.S.2d at 927. The *Snyder* court distinguished the case relied upon by this court to find a private cause of action under the Oil Spill Act.

## 2. *Statute of Limitations*

AI argues that even if a private right of action exists for AL Tech under the Oil Spill Act, AL Tech's claim against AI should be dismissed as time barred. The Oil Spill Act contains only one statute of limitations:

> § 182 *Claims Against The Fund*
>
> Claims shall be filed with the administrator not later than three years after the date of discovery of damage nor later than ten years after the date of the incident which caused the damage.

N.Y.Nav.Law § 182 (McKinney 1989). AI contends that if a private right of action existed under the Oil Spill Act, it would be subject to § 182 because it is the only time limitation stated in the Act. *King Service, Inc.*, 563 N.Y.S.2d at 333; *P.B.N. Assoc. v. Xerox Corp.*, 141 A.D.2d 807, 529 N.Y.S.2d 877, 878–879 (2nd Dep't 1988); *Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 44, 335 N.E.2d 275, 279 (1975). AI asserts that because it sold the steel plants to AL Tech in 1976, it ceased to be an "owner" under the Oil Spill Act. Therefore, any Oil Spill Act claim against AI for petroleum releases during AI's ownership must have been filed by 1986. AL Tech did not file its Oil Spill Act claim until 1989, therefore, AI believes that AL Tech's claim is time barred and must be disallowed under 11 U.S.C. § 502(b)(1).

In the alternative, AI argues that if the court determines that § 182 does not apply, then given the nature of AL Tech's claim, the appropriate statute of limitations to apply is the New York statute of limitations for property damage. NY CPLR 214[4] (McKinney's). Section 214(4) provides that an action to recover damages for an injury to property must be commenced within three years of the act causing the injury. *See, King Service, Inc.*, 563 N.Y.S.2d at 333 (the act alleged to constitute the accidental leaking of a contaminant is the point in time the three year statute of limitations begins to run); *see also, P.B.N. Assoc.*, 529 N.Y.S.2d at 878–879 (court applied three year statute of limitations for soil contamination from leak); *Victorson*, 373 N.Y.S.2d at 44, 335 N.E.2d at 279 (court applied three year statute of limitations to discoverable property damage at the time of injury).

■ AL Tech disagrees with AI's application of § 182. AL Tech maintains that, as its title suggests, § 182 applies only to those claims brought against the "Fund," and not actions against private parties. Therefore, rather than applying § 182, AL Tech believes that New York's general "catch-all" six year statute of limitations applies. NY CPLR 213(1).[14] AL Tech argues further that this six year statutory period begins to run from the time AL Tech expended the moneys for which it seeks recovery from AI. AL Tech failed to cite to any authority to support this proposition.[15]

■ The court believes that § 182 of the Oil Spill Act is not applicable to the instant case because AL Tech's claim is not against the Fund, but against a private party. This being the case, the court believes that the appropriate statute of limitations to apply is that for property damage. The New York general "catch-all" statute of

---

14. NY CPLR § 213 states in pertinent part:
The following actions must be commenced within six years:
1) an action for which no limitation is specifically prescribed by law.
The comments for § 213 suggest generally that the statute applies to those actions: "where not otherwise provided for; on contract; on sealed instrument; on bond or note, and mortgage upon real property; by state based on misappropriation of public property; based on mistake; by corporation against director, officer or stockholder; based on fraud." None of these applications refer to property damage of the sort involved in the instant case.

15. This court disagrees with AL Tech's proposition that the statutory period begins to run from the time AL Tech expended the moneys for which it seeks recovery from AI. Rather, the statutory period of limitations begins to run from the time when liability for the wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury. *Schmidt v. Merchants Despatch Trans. Co.*, 270 N.Y. 287, 200 N.E. 824 (1936) (cause of action for negligence). In the case at bar, the liability for the "wrong" arose when the petroleum oil contamination took place.

limitations applies only when there is no other statute of limitations on point. The facts of the instant case make the New York statute of limitations for property damage right on point.

■ The petroleum oil contamination AL Tech claims AI should pay for had to have taken place sometime before 1976, when AL Tech purchased the steel plants from AI. Therefore, the statute of limitations has expired and AL Tech's Oil Spill Act claim is precluded.[16]

### D. *Remediation: CERCLA and RCRA*

The selection of a remediation program for AL Tech's steel plants requires an understanding of the basis for a regulatory program. Various remedial programs serve different public policy purposes with different clean-up goals and standards. These differences lead to a selection of various programs with very different costs.

The CERCLA ("CERCLA" or "Superfund")[17] program and the Resource Conservation and Recovery Act ("RCRA")[18] are the two major regulatory programs dealing with environmental remedial action. These two programs have separate and distinct legislative and regulatory purposes. In 1980, Congress enacted CERCLA in response to widespread concern over the releases of hazardous substances into the environment at abandoned or inactive sites. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir.1992); *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197 (2d Cir.1992). The regulations promulgated under CERCLA are the National Oil and Hazardous Substances Pollution Plan or generally, the National Contingency Plan ("NCP"). 40 C.F.R. pt. 300 (1990)[19]. *See, e.g., Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1292 (D.Del.1987); *Ambrogi v. Gould, Inc.*, 750 F.Supp. 1233, 1253–54 (M.D.Pa.1990).

The NCP regulates the methods and procedures that must be carried out when a CERCLA cleanup is conducted. There have been several judicial interpretations of the meaning of the phrase "consistent with the National Contingency Plan." *See, NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898–99 (9th Cir.1986); *General Electric Co. v. Litton Business Systems, Inc.*, 715 F.Supp. 949 (W.D.Mo.1989); *Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 796 (D.N.J. 1989); *Versatile Metals*, 693 F.Supp. 1563 (E.D.Pa.1988). The EPA has recently included in its final NCP regulations provisions intended to define the requirements a private party must meet to satisfy the NCP consistency requirement. Generally, a party need only achieve "substantial compliance" in addition to numerous procedural requirements. *See*, 40 C.F.R. pt. 300, subpt. H (1990).[20]

Under CERCLA, liability is strict and applied retroactively. 42 U.S.C. § 9607(a)(4)(B). *See, Dedham Water Co. v. Cumberland Farms Dairy Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989); *O'Neil v. Picillo*, 883 F.2d 176, 178–79 (1st Cir.1989), *cert. denied sub nom. American Cyanamid Co. v. O'Neil*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v.*

---

**16.** It is important to note that even if the court had decided to apply one of the other two statutes of limitations, the court would have determined that AL Tech's claim would still have been precluded.

**17.** CERCLA established a $1.6 billion Hazardous Substance Superfund generated from taxes on the petroleum and chemical industries to be used by the government to clean up hazardous waste.

**18.** 42 U.S.C. § 6901 et seq. (1976).

**19.** The NCP was originally promulgated under section 311 of the Clean Water Act, 33 U.S.C. § 1321.

**20.** The NCP sets forth separate guidelines for performance of a remedial investigation/feasibility study (RI/FS) and the selection of a remedy. *See* 40 C.F.R. § 300.430. The purpose of a remedial investigation is to "collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives." 40 C.F.R. § 300.-430(d)(1). The objective of a feasibility study is to "ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected." 40 C.F.R. § 300.430(e)(1).

*Monsanto, Co.,* 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985). In addition, CERCLA provides that "any person may seek contribution from any other person who is liable or potentially liable under § 9607(a)." 42 U.S.C. § 9613(f)(1). These sections combine to create a private cause of action.

■ The necessary elements of a CERCLA private cost recovery action for contribution essentially include:

(1) The potentially responsible party (PRP) must fall within one of the four categories of "covered persons;"

(2) There must have been a "release or threatened release" of a "hazardous substance" from a facility;

(3) The "release or threatened release" must have caused the party seeking contribution to incur response costs;

(4) The response costs must have been "necessary;" and

(5) The response costs must have been incurred "consistent with the National Contingency Plan."

42 U.S.C. § 9607(a); *Artesian Water Co. v. Gov't of New Castle County,* 659 F.Supp. 1269, 1278 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 789–90 (D.N.J.1989); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir.1989); *See, also, Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1239 (M.D.Pa.1990); *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1571 (E.D.Pa.1988).

Unlike CERCLA which is remedial in nature, RCRA is regulatory in nature and concerns sites that have ongoing waste management activities. RCRA corrective action governs the management, handling, transportation, and disposal of hazardous waste by setting forth various procedures. In order to trigger jurisdiction under RCRA, a contaminating substance must be a "hazardous waste." Whether or not a waste is hazardous is based on concentrations of hazardous constituents in some numerical threshold amount. Consistent with this clean-up level philosophy, RCRA clean-up goals are established in the form of Corrective Action, Action Levels ("CAAL").

At this time the EPA has not promulgated corrective action regulations. However, the EPA has published corrective action guidance incorporating the proposed rules for use in implementing RCRA corrective action. Under these proposed rules, the goal of RCRA corrective action "is, to the extent practicable, to eliminate significant releases from solid waste management units that pose threats to human health and the environment, and to clean up contaminated media to a level consistent with reasonably expected, as well as current uses." 55 Fed.Reg. 30804. RCRA corrective action recognizes that it is non-sensical to require clean-up to unrestricted use (the basic goal of CERCLA remediation) only to have a pristine area in the midst of an ongoing operation that continues to manage (and potentially release) hazardous constituents.

In the instant case, the court will apply the appropriate corrective action standards to each of the thirteen contaminated sites to determine what the estimated response cost will be for each site.

### E. *Steel Plant Facilities: Estimation*

Each AL Tech facility described below represents a separate site upon which there have been environmental releases or threats of releases that may reasonably necessitate further investigation and remediation. The estimated costs for further investigation and remediation asserted by AL Tech were prepared by its expert, McLaren/Hart Environmental Engineering Corporation ("McLaren/Hart"). The estimated costs for further investigation and remediation for the same facilities asserted by AI were prepared by its expert, Environ Corporation ("Environ"). Both McLaren/Hart and Environ proved to be well qualified and credible experts that prepared extensive reports for the court to review.

Based on both McLaren/Hart's and Environ's testimony and reports, this court believes that a realistic estimation of response costs pursuant to CERCLA and a RCRA corrective action program is $12,-792,000.

As per the district court's instruction, the following is findings of fact regarding this court's estimation of each AL Tech facility for the purpose of determining AL Tech's claims against AI. There is also a brief discussion of the pertinent environmental issues concerning each facility.

### 1. *Willowbrook Pond*

The Willowbrook Pond is located at AL Tech's Dunkirk Plant, and provides cooling water via recirculation to a number of operations, including the rolling mill complex. Willowbrook Pond was constructed by Allegheny Ludlum in 1952 and was used exclusively by it until 1976. A provision of the sales agreement between Allegheny Ludlum and AL Tech resulted in the joint use of the pond by both firms until 1981. In 1981, Allegheny Ludlum sold the remainder of the complex to Special Metals who continued joint use of the pond until 1988. Since 1988, the pond has been used exclusively by AL Tech.

*Environmental Issues:* The environmental issues associated with the Willowbrook Pond are elevated levels of polychlorinated biphenyls ("PCBs")[21] and metals found in the unlined pond which may have penetrated below to the groundwater level. In 1976, Congress passed the Toxic Substances Control Act (TSCA)[22], which among other things, regulates the use and disposal of PCBs. A component of the PCB regulations established that any substance containing concentrations of PCBs above 50 ppm (parts per million) was, by definition, subject to regulatory controls. For concentrations greater than 500 ppm, the required method of disposal is incineration.

Remedial action of the pond is necessary due to the presence of nickel at levels exceeding CAALs and PCBs at levels above CAALs and the TSCA action level. No other constituents were detected at levels above CAALs. Moreover, the pond has been identified as a Solid Waste Management Unit ("SWMU") in a RCRA Facility Investigation ("RFI").

In 1987, PCB contamination was discovered in the Willowbrook Pond. As part of Willowbrook Pond's investigation, samples and analysis were completed between 1987 and 1989. Twenty-one percent of the samples contained PCBs at concentrations greater than 50 ppm. The maximum PCB contamination detected was reportedly 2,100 ppm. In 1989, the pond was broken down into 4 quadrants for testing. PCBs were detected in each quadrant above CAAL and the TSCA PCB spill policy action levels.

AI argues that AL Tech failed to prove by a preponderance of the evidence the facts necessary to establish that AI has *any* CERCLA liability for the alleged contamination at Willowbrook Pond. AI points specifically to the testimony of Mr. Morton Parker, one of AL Tech's witnesses who testified at the trial that he visited Willowbrook Pond in the mid–1970s while it was still owned and operated by Allegheny Ludlum. Mr. Parker testified that the hydraulic fluid used by Allegheny Ludlum at that time did not contain PCBs. Mr. Par-

---

**21.** Polychlorinated biphenyls (PCBs) are a group of related chlorinated hydrocarbon chemicals frequently used in electrical transformers because of their chemical stability, fire resistance, and electrical resistance properties. They are especially attractive because they have a high ignition temperature or "flash point" which reduces the likelihood of fire in the event of transformer rupture. However, PCBs are extremely toxic to humans and wildlife, and pose carcinogenic and other risks to humans. In 1976 Congress designated PCBs as toxic substances under 15 U.S.C. § 2605(e) (1976), and in 1978, the EPA was empowered under TSCA § 6(e) to set forth specific rules governing the disposal and making of PCBs. 40 C.F.R. part 761 (1978).

*See, Environmental Defense Fund v. E.P.A.,* 598 F.2d 62 (D.C.Cir.1978) and *Environmental Defense Fund v. E.P.A.,* 636 F.2d 1267 (D.C.Cir. 1980) for an excellent discussion of the Congressional history behind the regulation of PCBs.

**22.** Toxic Substances Control Act, 15 U.S.C.A. § 2601 *et seq.,* Pub.L. No. 94–469, 90 Stat. 2003 (1976).

ker also testified that it was his opinion that the "likely" source of the PCBs was the previous use of a PCB–containing hydraulic fluid in the steel plant's rolling mill, which was a significant period of time before AL Tech purchased the steel plants. Mr. Parker's testimony is the only evidence in the record that supports this proposition.

At trial, AI objected to Mr. Parker's testimony, but the court allowed the testimony into the record. However, Mr. Parker's testimony was not based upon his own first hand knowledge of the hydraulic fluids used by Allegheny Ludlum and his testimony is subject to a hearsay objection.

AL Tech asserts that it has incurred to date $142,284 in response costs for Willowbrook Pond, and McLaren/Hart estimates that it will cost $13,998,400 to properly investigate and remediate the pond. Environ estimates the costs for McLaren/Hart's remedial program using alternative unit cost estimates at $4.9 to $5.7 million. McLaren/Hart's proposed remedial program includes draining the pond, removing and dewatering pond sediments and soils from the pond berm, off-site incineration, backfilling, and the installation of a replacement cooling system.

Environ's proposed remedial program estimates a cost of $990,000 to $1,300,000 to remediate Willowbrook Pond. Environ developed two potential options [23] for remediation of the pond, both of which propose to do what McLaren/Hart's plan proposes except for the backfilling and the installation of a replacement cooling water system. Moreover, both of Environ's remedial programs are consistent with RCRA corrective action requirements.

It is clear from the record that Willowbrook Pond is highly contaminated, however, the court does not consider the installation of a replacement cooling water system to be a remedial action. Rather, it is a preventative measure. These costs are eliminated. In addition, Environ's remediation proposal will be adopted by the court because it meets RCRA corrective action requirements. Therefore, the estimated response cost for Willowbrook Pond is $1,300,000.[24]

However, this court does not believe that AL Tech met its burden of proof that AI is responsible for the PCB contamination of the Willowbrook Pond. In the absence of this proof, this court cannot impose liability upon AI. Consequently, for the purposes of AL Tech's claim against AI, AL Tech's claim is estimated at zero ($0).

## 2. Brigham Road Plant Waste Acid Pit

The Brigham Road Plant Waste Acid Pit is part of the Dunkirk Plant and it was utilized for the accumulation of pickle house wastes prior to their treatment and disposal. The waste acid pit was constructed by Allegheny Ludlum in 1948. The pit has not been used for accumulation of pickling wastes since pickling was discontinued by AL Tech in 1991. The pit is approximately 13 feet deep with a holding capacity of 14,000 gallons. Total wall and floor thickness is reported to be 18 to 24 inches.

*Environmental Issues:* The extremely acidic environment within the waste acid pit tends to attack the mortar surrounding the acid bricks. Any releases would tend to percolate downward to the water table. Soil samples were taken and analyzed for certain containments, and no hazardous metals were detected above CAALs. Ground water samples were also analyzed and no organic or inorganic constituents were detected above CAALs and MCLs.

AL Tech has incurred costs of $21,219 thus far, and McLaren/Hart estimates that it will cost an additional $296,600 to remediate and close the pit. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates

---

**23.** Environ's remedial program options include: (1) Segregate, remove, and dewater sludge and incinerate any sludge with >500 ppm PCBs and landfill sludge with <500 ppm; or (2) remove sludge from pond, bioslurry, dewater and landfill residue and landfill soils from berm slide-slopes.

**24.** The court's response cost estimations for each site will be rounded up to the nearest thousand.

at $73,000. McLaren/Hart's proposed remedial program includes demolition and removal of the pit, excavation and off-site disposal of surrounding soils, and backfilling the pit with clean fill.

Environ estimates that it will cost an additional $15,000 to $20,000 for the field investigation, and that no other monies need be spent on remediation in the meantime. Environ concluded that McLaren/Hart's remediation proposal was based on speculation that the pit has leaked in the past or presents the risk of leaking in the future. Therefore, Environ concluded that · no remedial action was warranted, but that to confirm the field test results, a more extensive remedial investigation should be conducted.

This court believes that the evidence of contamination does not establish that RCRA corrective action is required at this time and that additional investigation is needed at this site. Therefore, the estimated response cost the Brigham Road Plant Waste Acid Pit is $20,000.

### 3. *Lucas Avenue East Waste Acid Pits*

The Lucas Avenue East pickle house, located at the Dunkirk Plant, utilized two waste acid pits for the accumulation of pickle house wastes prior to their on-site treatment and disposal. The pits are constructed of concrete and lined with acid brick. The pits were constructed by Allegheny Ludlum in 1940. The pickle house was closed in 1984, and the pits have not been used since that time.

*Environmental Issues*: The environmental issues are the same as those discussed above in reference to the Brigham Road Waste Acid Pit. A ground water monitoring well was installed in 1989. At that time, soil and ground water samples were taken and analyzed, and results indicated that no constituents were detected at levels above CAALs and MCLs. However, two (2) volatile organic compounds were detected in ground water samples.

AL Tech asserts that it has incurred costs of $21,219 thus far, and McLaren/Hart estimates that AL Tech will spend an additional $461,000 for complete remedi-

ation, consisting of excavation and off-site disposal of surrounding soils, backfilling the pit with clean fill and installing and operating a ground water remediation system to address volatile organic compound contamination. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $82,000 to $87,000.

Environ's analytical results indicate that no constituents were detected at levels above CAALs and MCLs. Therefore, Environ suggests that no remedial action is necessary for this unit because no significant releases to environmental media resulting in residual contamination has occurred as a result of operation of the waste acid pits. Remedial action is therefore not warranted under RCRA corrective action. However, Environ does suggest that further field testing is necessary and estimates that such testing will cost $15,000 to $20,000.

Because the evidence presented does not establish that RCRA corrective action is required at this time, the court believes that additional investigation must be conducted at this site. Therefore, the court's estimated response costs for the Lucas Avenue East Waste Acid Pits is $20,000.

### 4. *Lucas Avenue West Pickle House*

The Lucas Avenue West Pickle House, located at the Dunkirk Plant, was used for finishing and surface preparation of steel products utilizing acid and caustic baths and rinses. The pickle house was constructed by Allegheny Ludlum in 1943. Pickling operations were discontinued by AL Tech in 1989. At the time operations were discontinued, the west pickle room reportedly contained 15 vats inside the building and two pits outside which held various acids, caustics, and rinse waters. In addition, there were two above ground storage tanks reportedly located outside the pickle house that were used to store virgin sulfuric and nitric acid.

*Environmental Issues:* Hexavalent chromium and silver constituents were detected in ground water samples in concentrations above CAALs and MCLs. Total

chromium was also detected above the CAAL in one indoor soil sample. The source of the contamination appears to be from the soils outside the pickle room and there is presently no evidence to suggest that sources of contamination exist within the building structure or in its underlying soils. There is visual evidence of staining of the soils and wastewater sludge and liquid throughout the length of the trench. To insure that no future contamination originates from the pickle house however, remediation is required underneath the caustic bath around the structural components inside the building.

AL Tech asserts that it has incurred costs of $33,764 thus far, and McLaren/Hart estimates that it will cost an additional $1,850,000 to complete the remediation. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $710,000. AL Tech's proposed remedial program includes removal of all materials currently existing inside the pickle house, complete demolition of the building and disposal of resultant debris, excavation and disposal of surrounding soils, and backfilling excavated areas with clean fill.

Environ estimates that remediation will cost $390,000. Environ's proposed remedial program includes washing the walls and floors of the pickle house, removal, treatment and disposal of metal precipitate from interior portions of the pickle house, removal of any liquids present in the trenches, and limited excavation and backfilling of soils outside the building. Environ does not believe that all the components of McLaren/Hart's remedial program are required for the pickle house because there was no analytical data available to support this type of extensive clean up. In addition, such remediation is unnecessary to achieve the remedial objectives consistent with RCRA corrective action. To the extent that some materials may have penetrated the structure, it is not likely that this represents a significant source of contamination to surrounding environmental media. Environ's remedial program will eliminate the primary source of ground water contamination while mitigating the potential for future releases.

Based upon Environ's remediation analysis, the court estimates future response costs for the Lucas Avenue West Pickle House to be $390,000.

### 5. *Watervliet Waste Acid Pits*

There are two waste acid pits located at AL Tech's Watervliet Plant, which, until their retirement in September, 1991, were utilized to accumulate waste sulfuric and nitric/nitric-hydrofluoric acids from pickling operations prior to their treatment and disposal. The pits were constructed by Allegheny Ludlum in 1952. Each waste acid pit had dimensions of approximately $8' \times 15' \times 15'$ with a useable capacity of 9,000 gallons. Total wall thickness was 24 inches. When the pits were discontinued in 1991, a pair of 9,000 gallon tanks were installed for waste accumulation.

*Environmental Issues:* The environmental issues are similar to those associated with the Dunkirk waste acid pits. There is potential leakage from the pits through there walls and/or floors. Due to the presence of beryllium in the soil and various metals in the ground water exceeding CAALs and MCLs, remedial action is required for the acid pits. The focus of the remediation is to focus on source elimination and to mitigate the potential of metals within the soil that could leach to ground water.

AL Tech has incurred costs of $21,219 thus far, and McLaren/Hart predicts that it will cost an estimated $817,000 for the remediation of the pits. McLaren/Hart's proposed remedial plan includes complete removal and disposal of the pits and surrounding soils, and backfilling. In addition, McLaren/Hart proposes the installation of a ground water extraction system with discharge to an on-site wastewater treatment plant.

Environ estimates that the cost of remediation will be $77,000 to $110,000. Environ's proposed remedial program includes leaving the acid pits intact and draining them to an on-site treatment plant and backfilled. A clay cap would be installed

to prevent storm water infiltration that could potentially cause migration of residual metals present in the soil. Finally, just as McLaren/Hart proposes, a ground water extraction system would be installed that would discharge to the on-site treatment plant.

Based on Environ's remedial program analysis, the court estimates the response costs for the Watervliet Waste Acid Pits to be $110,000.

### 6. *South Lagoon*

The South Lagoon is located at AL Tech's Watervliet Plant. The lagoon is an $18' \times 40' \times 6'$ deep collection impoundment that was constructed by Allegheny Ludlum in 1972 to minimize the discharge of oil to a nearby creek from the plant's extrusion operation through waste water flow equalization and oil skimming. Two skimming pumps collected floating oil and the collected oil was transferred to a collection tank. Water flowed over a weir to a pipe which discharged to the Kromma Kill. The bottom of the lagoon is reportedly lined with clay and the sides are welded steel plate. AL Tech discontinued use of the lagoon in 1990 with the construction of an API oil separator unit.

*Environmental Issues:* There is the potential for groundwater and soil contamination associated with the constituents of the sludges in the lagoon. Moreover, liquids may have migrated through the clay liner during lagoon operation, while general operations may have resulted in spillage and localized soil contamination in the immediate vicinity of the lagoon. Reports have shown so far that TPH (*T*otal *P*etroleum *H*ydrocarbons) and PCBs were detected at concentrations exceeding the CAAL. In addition, barium and lead were detected above their respective MCLs.

AL Tech asserts that it has incurred costs of $34,825 thus far,[25] and McLaren/Hart estimates that it will cost an additional $561,200 for complete remediation. Environ estimates the costs for McLaren/Hart's remedial program using alternative unit cost estimates at $360,000 to $370,000. Tests have detected that contaminants exist in the groundwater and McLaren/Hart believes that such contamination was the result of prior leakage through the lagoon's clay liner. McLaren/Hart's proposed remedial program targets sludge, surrounding soils, and ground water. The program includes excavating and TSCA landfilling the sludge and surrounding soils, backfilling, and ground water extraction and treatment.

Environ estimates that it will cost $110,000 to complete remediation. Environ believes that based on the analytical data collected thus far, the extensive remediation proposed by McLaren/Hart in unnecessary for compliance with RCRA corrective action requirements. Environ's remedial program focuses on the removal of PCB-contaminated sludge and liner material. The sludge and liner would be segregated and disposed of according to the level of PCB contamination. Environ's remedial program does not include any remediation of the surrounding soils because of the lack of documented evidence of contamination. Finally, additional field investigation is also proposed to fully evaluate the extent of contamination.

This court believes that the amounts of contamination established in McLaren/Hart's report warrants more remediation than Environ estimates. Therefore, the estimated response cost for the South Lagoon is $561,000.

### 7. *Oil Contamination Area*

An approximate 11–acre portion of the Watervliet Plant is contaminated with fuel oil from spills and leaks associated with the Plant's former underground oil distribution system. Groundwater underlying this portion of the site reportedly migrates southeasterly, discharging into the Kromma Kill. Several potential sources of contaminant releases to the environment exist within this area including leakage from oil pipe-

---

**25.** In December 1988, McLaren/Hart drilled and installed two groundwater monitoring wells southwest of the lagoon.

lines and oil spills associated with facility operations.

*Environmental Issues:* The prime issue of concern associated with the oil contamination area is the steady migration of contaminated products toward the Kromma Kill and potential contamination of the Kromma Kill. Moreover, the NYDEC has instructed AL Tech to improve and expand the collection area of its recovery well pursuant to the Oil Spill Act.

No analytical results were reported by McLaren/Hart. It is noted, however, that some soil samples indicate the presence of fuel oil. Soil sampling also detected significant petroleum contamination at the water table.

AL Tech asserts that it has incurred costs of $30,570 thus far, and McLaren/Hart estimates that it will cost an additional $778,000 to complete remediation. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $420,000 to $440,000. Environ estimates that remediation will cost $97,000 to $140,000.

Based upon Environ's remediation analysis, it is determined that the estimated cost of remediation pursuant to the Oil Spill Act will be 140,000. However, because remediation of the Oil Contamination Area is based upon liability under the Oil Spill Act, AI is not liable for contribution under this Act because the statute of limitations has run. Therefore, AL Tech's claim for contribution against AI for the Oil Contamination Area is $0.

### 8. *Watervliet Solid Waste Landfill*

The Watervliet Landfill is located on property owned by AL Tech adjacent to Watervliet Plant. The three major components of this facility include the solid waste landfill, two basins within the landfill, and a closed surface impoundment. The landfill is currently utilized for the disposal of solid waste from AL Tech's steelmaking operations, however, the landfill has received a variety of waste since its inception in the late 1950's. Prior to 1979, unconsolidated EAF dust and wastewater treatment plant sludge was reportedly deposited on the north face of the landfill. The landfill was developed without a liner system and it is reported to have a fill thickness of 70 to 80 feet.

*Environmental Issues:* The landfill does not incorporate any containment system, therefore, leachate generated in the landfill can migrate downward to groundwater or laterally to the adjacent Kromma Kill. AL Tech identified the existence of apparent leachate seeps on the north face area of the landfill. AL Tech has since undertaken and completed an interim corrective action on the north face of this landfill pursuant to a Consent Decree with the NYDEC. AL Tech has submitted plans to the NYDEC for an Interim Corrective Measure ("ICM") to mitigate off-site migration of contaminants from the north face area of the landfill.

AL Tech has incurred costs of $3,279,425 thus far, and McLaren/Hart estimates that it will cost an additional $11,135,460 to complete remediation. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $8,600,000. McLaren/Hart proposes to close the remaining portions of the landfill which includes the following components: 1) installation of a final cap; 2) installation of a gas venting system; and 3) installation of a ground water extraction system. Components of the ICM plan include excavation and segregation of materials from the north face area, regrading of the outer slope area, installation of a leachate collection system, and installation of a single liner cap.

Environ estimates that remediation will cost an additional $4,500,000. Environ's remedial program includes costs for a cap, a perimeter leachate collection system, surface water management, and ICM implementation.

Because of the large amounts of contamination supported by both experts' reports, this court estimates the response cost of the Watervliet Solid Waste Landfill to be $11,136,000.

## 9. *PCB Contamination*

AL Tech's Watervliet Plant has utilized and continues to utilize some PCB-containing electrical equipment. McLaren/Hart reports that the Watervliet facility historically used a significant number of PCB capacitors and transformers. Some leaking hydraulic fluids used in the manufacturing processes also reportedly contained PCBs. This historic use of PCB-containing fluids and equipment at the facility has resulted in various areas of potential PCB contamination.

*Environmental Issues:* Outdoor soil samples tested and analyzed by McLaren/Hart indicate the presence of PCBs in the shallow soil at the Watervliet Plant. More specifically PCB's in excess of the CAALs, the TSCA threshold, and the TSCA PCB action level were detected. The TSCA spill policy requires cleanup of soils to 25 mg/kg or 50 mg/kg (with a sign posted) PCBs at outdoor electrical substations. Therefore, in the instant case, the existing posted sign is in compliance within these requirements.

AL Tech asserts that it has incurred costs of $12,302 thus far, and McLaren/Hart estimates that it will cost AL Tech an additional $86,960 to complete remediation. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $28,000. McLaren/Hart's proposed remedial program includes the cleanup of PCB contaminated soils to 1 mg/kg. To accomplish this, soil excavation and off-site TSCA landfill disposal is proposed.[26]

Environ estimates that it will cost AL Tech an additional $16,000. Environ's remedial program is consistent with the TSCA spill policy for operating industrial sites and for outdoor substations where appropriate. The program includes limited excavation and off-site disposal of soil in the Rolling Mill courtyard area and limited additional field investigation to fully delineate the extent of contamination.

Based upon Environ's remediation analysis, this court estimates the response cost of the PCB Contamination to be $16,000.

## 10. *Pump House and Aboveground Fuel Oil Tank*

The pump house building, a 300,000 gallon above ground fuel oil storage tank, and a waste oil tank were constructed at the Watervliet Plant by Allegheny Ludlum in approximately 1943, to provide fuel oil for operations at the plant. The pump house was closed by AL Tech in 1989, and the above ground tank was emptied and cleaned in 1991. It is reported that a release of fuel oil from the above ground tank occurred prior to 1965.

*Environmental Issues:* There is evidence of soil contamination by petroleum hydrocarbons throughout this area. Other potential sources of petroleum contamination at this location include leakage from product lines, valving at the pump house, spills from the waste oil tank located adjacent to the pump house, and leakage at the valve shed.

Soil and ground water samples were tested for TPH because the presence of TPH in the soil will likely require remedial action even though there is presently no CAAL for TPH. Analytical results indicate no significant impact on the ground water; therefore, remedial objectives should focus on the contaminated soils.

AL Tech asserts that it has incurred costs of $30,570 thus far, and McLaren/Hart estimates that it will cost an additional $1,763,500 to complete remediation. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $730,000. McLaren/Hart's proposed remedial program consists of excavation and disposal of the TPH contaminated soil, backfilling, installation of a ground water recovery system with chemical treatment, and disposal

---

**26.** It doesn't appear that the current regulatory framework under the TSCA spill policy that PCB cleanup to 1 ppm is necessary. Furthermore, the concentrations of PCBs present in soils at the facility are not high enough to require TSCA landfill disposal, which is required for soils containing PCBs in excess of 50 ppm.

of the aboveground tanks and their contents.

Environ estimates that it will cost $190,-000 to $340,000 to complete remediation. Environ's proposed remedial program includes *in situ* bioremediation of the TPH contaminated soils in lieu of excavation and off-site disposal. Environ represents that *in situ* bioremediation technology has been demonstrated effective for treating TPH contaminated soils. In addition, some incidental ground water treatment will be accomplished through implementation of this program.

This court believes that the proposed bioremediation is appropriate and the most cost effective method of remediation. The total remediation may take longer to accomplish, but it is no less effective. Therefore, the estimated response cost for the Pump House and Aboveground Fuel Oil Tank is $340,000.

### 11. *Underground Fuel Tanks*

Seven underground fuel oil storage tanks were installed by Allegheny Ludlum at the Watervliet Plant in the 1930's, and they were closed by Allegheny prior to 1976.

*Environmental Issues:* It is likely that some petroleum-contaminated soil and groundwater exists in the area surrounding the tanks. This is supported by soil and groundwater sampling that detected TPH.

AL Tech asserts that it has incurred costs of $30,570 thus far, and McLaren/Hart estimates that it will cost an additional $1,208,000 to complete remediation. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $240,000 to $250,000. McLaren/Hart's proposed remedial program consists of excavation and off-site disposal of the contaminated soils, backfill, installation of a groundwater recovery system with chemical treatment, and removal and disposal of the tanks.

Environ estimates that the cost of remediation will be $69,000 to $110,000. Environ proposes RCRA corrective action that includes tank and soil removal and ground water remediation. Environ does not believe that is necessary to remove the tanks or engage in extensive groundwater remediation.

Based upon Environ's remediation analysis, the estimated response cost for the Underground Fuel Tanks is $110,000.

### 12. *Kromma Kill*

The Kromma Kill is a stream that originates slightly upgradient from the Watervliet landfill, and borders portions of AL Tech's Watervliet Plant. The Kromma Kill flows southeasterly to the Hudson River.

*Environmental Issues:* In the "northern" drainage network, which drains the landfill area south into the facility's northeast perimeter, TPH concentrations increase primarily in a downgradient direction. Sediment samples of the Kromma Kill indicate the presence of TPH. PCBs were not detected in any of the sampling.

Al Tech asserts that it has incurred costs of $12,302 thus far, and McLaren/Hart estimates that it will cost an additional $695,-700 to complete remediation. Environ estimates the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $170,000. McLaren/Hart's proposed remedial program consists of removal and off-site disposal of sediments as well as soil from the banks of the stream.

Environ estimates that it will cost AL Tech an additional $56,000 to $89,000. Environ's proposed RCRA corrective action program includes *ex situ* bioremediation of the contaminated sediment and soils. Components of this program would include excavation of sediments from the Kromma Kill above 100 mg/kg and transport of the sediments to an on-site location.

Based upon Environ's remediation analysis, the estimated response cost for the Kromma Kill is $89,000.

### 13. *Melt Shop*

The Melt Shop is located at AL Tech's Watervliet Plant and it is used for the melting and manufacturing of steel. The Melt Shop consists of two 30–ton electric arc furnaces (EAF) with associated support

equipment such as the baghouse located immediately adjacent to the building. The Melt Shop was constructed by Allegheny Ludlum in 1952, and it continues in operation today.

*Environmental Issues:* EAF operations produce significant quantities of dust which is a listed hazardous waste. Approximately 50 tons/month of dust is collected pneumatically by an emission control system that was installed in 1970. It is reported that horizontal surfaces within the Melt Shop have been coated with 6–8 inches of EAF dust over the years of operation, and current operations result in the continuing release and deposition of dust.

It is presently unclear what regulatory framework will ultimately apply to this particular site. Due to the presence of EAF dust, remedial action may be required once the facility is closed, but the applicable action will depend upon the future operating status of the Melt Shop. It seems clear, however, that the Melt Shop does not currently meet the regulatory definition of a SWMU, and thus is not subject to RCRA corrective action requirements.

AL Tech asserts that it has incurred costs of $12,302 thus far, and McLaren/Hart estimates that it will cost an additional $1,169,500 to complete remediation. Environ estimated the cost for McLaren/Hart's remedial program using alternative unit cost estimates at $81,000 to $160,000. McLaren/Hart's proposed remedial program includes the complete removal and off-site disposal of the EAF dust.

Environ estimates that remediation will cost $0. Environ does not believe that any action to remediate the Melt Shop is required under the current applicable regulatory framework.

The court believes that McLaren/Hart failed to establish that its remedial program is required under RCRA corrective action. Therefore, the estimated response cost for the Melt Shop is $0.

### 14. *Estimated Cost Summary*

1. Willowbrook Pond ................................................... 0
2. Brigham Road Plant
   Waste Acid Pit ............................................... 20,000
3. Lucas Avenue East
   Waste Acid Pits ............................................. 20,000
4. Lucas Avenue West
   Pickle House ............................................... 390,000
5. Watervliet Waste Acid Pits ....................................... 110,000
6. South Lagoon ................................................ 561,000
7. Oil Contamination Area ............................................... 0
8. Watervliet Solid Waste
   Landfill ................................................. 11,136,000
9. PCB Contamination ............................................. 16,000
10. Pump House and Aboveground
    Fuel Oil Tank ............................................. 340,000
11. Underground Fuel Tanks ......................................... 110,000
12. Kromma Kill ................................................ 89,000
13. Melt Shop ....................................................... 0

   TOTAL ............................................... **$12,792,000**

### F. *Equitable Allocation*

AL Tech believes that this court should allocate the response costs based primarily upon years of ownership and operation of the steel plants. Based on this method of allocation, AL Tech asserts that AI should be made responsible to pay for approximately 64% of the total estimated cost.

AI maintains that if AL Tech's claim is estimated at anything above $0, AL Tech would obtain a windfall at AI's expense. More specifically, AI contends that all relevant equitable factors favor AI and preclude AL Tech from shifting any of its responsibility to AI. For the reasons stated below, this court agrees with AI.

Where more than one party is responsible for the release of hazardous substances, CERCLA provides that:

> In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

42 U.S.C. § 9613(f). "CERCLA expressly conditions the amount of contribution on the application of [relevant] equitable considerations." *Smith Land & Improv. Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir.1988), *cert. denied, Celotex Corp. v. Smith Land & Improv. Corp.*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). Therefore, the mere fact that a party may be liable under CERCLA does not *ipso facto* mean that such a party is responsible for any portion of the cleanup costs. The statute provides that "[a]lthough the only defenses to liability remain those set forth in Section [9607(b)], courts are to resolve such claims on a case-by-case basis, taking into account relevant equitable considerations." [27]

In one case, the District Court for the Eastern District of Pennsylvania stated "the extent of an owner/operator's recovery of response costs should also depend upon: the owner/operator's relative fault, the volume of waste deposited, and the relative toxicity of such waste." *Chemical Waste Management, Inc. v. Armstrong World Industries, Inc.*, 669 F.Supp. 1285, 1292 n. 10 (E.D.Pa.1987). Another court established six criteria to consider in equitably apportioning liability among mutually responsible PRP's. Those criteria include:

> (1) the ability of the parties to distinguish their contributions to the release;
>
> (2) the amount of hazardous substance involved;
>
> (3) the degree of toxicity of the hazardous substance involved;
>
> (4) the degree of involvement by the parties in the generation transportation treatment, storage or disposal of the hazardous substance;
>
> (5) the degree of care exercised by the parties with respect to the hazardous substances concerned; and
>
> (6) the degree of cooperation by the parties with government officials to prevent any harm to the public or the environment.

*United States v. A & F Materials Co.*, 578 F.Supp. 1249, 1256 (S.D.Ill.1984); *See,* H.R.Rep No. 253(III), 99th Cong., 2d Sess. 19 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 3038, 3042).

The Court of Appeals for the Seventh Circuit noted recently that, "in any given case, a court may consider several factors, a few factors, or only one determining factor ... depending on the totality of circumstances presented to the court." *Environmental Transp. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992).[28] The goal is to arrive at the "just," "right" and "fair" result that is "in the interest of justice." *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 572 (6th Cir.1991).

AL Tech argues that the respective years of operation of each facility is a reasonable and equitable basis for allocating the respective responsibilities of AL Tech and AI for the remediation costs. More specifically, AI owned and operated the steel plants for over 39 years. AL Tech maintains that during that period of ownership, AI's operations significantly contributed to the con-

---

27. H.R.Rep. No. 253(I), 99th Cong., 1st Sess. 1, 80 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 2861–62.

28. *See also, United States v. R.W. Meyer, Inc.,* 932 F.2d 568, 572–73 (6th Cir.1991) (courts have "flexibility" in selecting and applying relevant equitable factors in light of the "totality of the circumstances"); and *Weyerhaeuser Co. v. Koppers Co.,* 771 F.Supp. 1420, 1426 (D.Md.1991) ("the Court is not limited to any specific equitable factors but may consider those factors relevant to the circumstances of the case").

tamination of the thirteen separate facilities which have and will continue to result in response costs incurred to AL Tech. AL Tech maintains that although it has owned and operated the two steel plants for the past 15 years, this was a time of increased sensitivity and governmental controls over environmental matters.

The actual years of ownership and operation is a significant factor this court will consider in its final decision. However, this court considers the discounted purchase price for the AL Tech steel plants to be the most compelling and dispositive allocation factor in this case. As the Court of Appeals for the Third Circuit explained ... "if the tract's price is reduced to allow for future environmental clean-up claims, the purchaser should not be entitled to double compensation." *Smith Land & Improv. Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir.1988) (citing, *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985)).[29] The amount of the discount, if any, the cost of remediation, and other considerations enter into the allocation of contribution by the court in its exercise of discretion. *Id.* Referring to *Smith Land*, the Court of Appeals for the Fifth Circuit held that "the circumstances and conditions involved in the property's conveyance, including the price paid and discounts granted, should be weighed in allocating response costs." *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 673 (5th Cir.1989).[30]

As stated in the factual summary of this Memorandum Opinion, the Dunkirk and Watervliet plants have been bought and resold three times since AI owned and op-

erated the plants in 1976. AL Tech's current owner (Sammi Steel Company) visited the steel plants and hired an environmental consultant to evaluate the properties. In addition, Sammi was provided with other materials, including the "Schedule 14" that described the current and potential environmental liabilities of the plants.

Sammi acquired AL Tech with full knowledge of the future environmental liabilities and as a result, discounted the purchase price dollar for dollar until the total purchase price was $1.00. Moreover, the agreement between Rio Algom and Sammi also provided for a purchase price adjustment at the time of sale to reflect any change in net worth. Contemporaneous with the transfer of ownership, AL Tech and Sammi "accrued" more than $22 million for expected future environmental expenses. These accrued expenses were charged against the cost of goods sold during the first seven months of 1989, and they materially reduced AL Tech's net worth. After litigation and arbitration between Rio Algom and Sammi over the propriety of accruing the $22 million of expected future environmental liabilities, the net result was that Rio Algom, the seller, is required to pay Sammi, the buyer, $6.5 million to assume ownership of AL Tech.

Therefore, because the evidence establishes that Sammi subtracted the projected environmental costs "dollar for dollar" from the purchase price, Sammi held no real expectation that AI would pay for any portion of the remediation costs. To effect such a result now would provide AL Tech's owners with a double recovery. Sammi purchased the steel plants at a discounted price which reflected the potential remedia-

---

**29.** 42 U.S.C. § 9607(b) lists the available CERCLA defenses as an act of God, an act of war, or an act or omission of a third party. Although section 9607(b) does not list caveat emptor as an available defense, the Third Circuit stated that caveat emptor may affect the amount of an award for contribution. *Smith Land*, 851 F.2d at 87.

**30.** Similarly, the district court in *Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994, 1003 (D.N.J.1988) stated that a plant's "discounted price" was an equitable consideration that could

"be raised at trial to mitigate damages" in a CERCLA Section 113(f) contribution action. *See also, BTR Dunlop, Inc. v. Rockwell Int'l Corp.*, 1992 WL 159203, 1992 U.S.Dist. LEXIS 9474 (N.D.Ill. June 26, 1992) and *South Florida Water Management District v. Montalvo*, 1989 WL 260215, Haz.Waste Lit.Rep. 14202, 14305 (S.D.Fla. Feb. 17, 1989) (both of these cases noted that the issue of whether the purchaser paid less for the land because the property was contaminated was a very significant equitable factor).

tion costs. To now shift the obligation to pay for such expenditures to the former owner who has no present legal interest in the more valuable remediated plants would be unjust.

In addition, other equitable facts exist that this court considers persuasive for the purpose of allocation. First, prior to AI's sale of the steel plants to AL Tech in 1976, there were only two federal environmental statutes that AI was required to observe: the 1972 Clean Water Act and the 1970 Clean Air Act. AI successfully complied with these two Acts and warranted such conformity in its sales agreement with AL Tech. No claim has ever been brought against AI for breach of this warranty.

Second, the record establishes that since 1976, AL Tech has devoted little effort and very little money on environmental compliance. It was AL Tech's lack of a sophisticated staff and financial support for remediation programs that compounded the environmental problems that exist today at the steel plants. Third and finally, AL Tech's slow response to the federal and state environmental regulators is a factor this court must consider.

## IV. CONCLUSION

The total estimated response cost for all thirteen (13) AL Tech sites is $12,792,000. This court holds that the responsibility for paying for the first $22 million spent on the environmental cleanup of the AL Tech Dunkirk and Watervliet steel plants belongs to AL Tech. The $22 million amount represents the amount of projected and accrued liabilities actually known to Sammi at the time it purchased AL Tech and the steel plants. Therefore, because the estimated response costs do not exceed $22 million, AI is not required to contribute any amount to AL Tech. AL Tech's claim is disallowed. 11 U.S.C. §§ 502(c) and 502(e)(1)(B).