Tucker, P.
In the discussion of the respective lights of these parties, a very wide debate has been indulged, in the investigation of the legislative power, and the constitutionality of the charter granted by it to the Railroad Company, to the prejudice, as is alleged, of the Tuckahoe Canal Company, whose charter is of anterior date.
Conceding, without question, the power of the judiciary to examine into and decide upon the constitutionality of laws, it cannot be denied, that it is a power which ought not to be lightly exercised. The separation of the legislative and judicial powers, and the inhibition of the invasion by the. one of the powers of the other, demands that we should be cautious lest we transcend our own limits, in the attempt to confine a co-ordinate branch within its legitimate boundaries. We must carefully distinguish between legislative discretion and legislative power. With the former we have nothing to do, however harshly or injudiciously it may have been exercised. With us, this question is a question of power, not a question of the judicious exercise of it. With these views of our authority to pronounce upon the constitutionality of a law, I have *72 considered the questions submitted in this case with earnestness due to their importance.
The first appears to me to admit of no reasonable j-fc pag peen contended, that a charter having peen granted to the Canal Company for the construe- ° , , . ,. . . tion oí a canal along a certain line, it is not within the constitutional power of the legislature to grant another charter for another improvement running side by side with the first, although in the first charter there is no express grant of exclusive right, and although the second improvement does not cross the line of the first. On the other hand, it is contended, that if the grant contained in the first charter be not exclusive, if the law which created it has not provided that no rival improvement shall be constructed by legislative authority, it is at all times competent to the legislature to grant new charters to rival companies upon the same line, even though the value of the first may be impaired or utterly annihilated thereby. In the latter opinion I concur. Such legislation may be, and indeed often is, unwise, unjust and ruinous; but those are considerations which are in vain addressed to us, where the legislative body acts within the pale of its authority. That authority knows no limit but the charter of the government, and in that charter the only relevant provision is that no law shall be made impairing the obligation of contracts. The question then resolves itself into this:' Has the legislature contracted with the Canal Company, that it shall have the exclusive transportation of the Tuckahoe valley, and that no rival company shall be incorporated which may impair its profits or take away its custom ? That it has expressly done this, cannot be pretended. The act of incorporation contains no such provision. Is such a contract on the part of the government to be implied from the grant of the charter for the construction of the canal ? I think not. It can never be con *73 ceded, that the incorporation of one company for internal improvement, is an implied negative of all ture power in the legislature to incorporate other companies for other improvements. Such has never been the interpretation of legislative grants in Virginia, but wherever exclusive rights are intended, express provisions are introduced for the purpose of tying up the hands of the legislature, and restricting the future exercise of legislative power. It never was dreamed, that the establishment of one bank was in itself a negative on the power to establish others. It never has - been admitted, that making one railroad was a negative to all future power to construct another which might rival it; but where that was the design of the charter, it has ever been so expressed; as in the act of 1833, ch. 3, § 38, the rights of the Richmond and Fredericksburg Railroad Company are expressly protected, for a limited time, against all rival charters. Were it otherwise, what difficulties would present themselves! Without express and definite provisions and limitations, how could we ascertain the extent of the exclusive right? Experience has proved, that monopoly is very ingenious in extending its rights and enlarging its pretensions. Give it the carte blanche of an implied contract, and we should soon find it without other limit than the limits of professional ingenuity; and the great mischief would at once present itself, of the improvement of the country being arrested by the perpetual objection of interference with chartered rights. Chartered companies are ever sensitive at the approach of a rival, and if the discovery of a possible clashing of interests shall be held sufficiently to nullify a subsequent charter, it is impossible to foresee to what extent the legislative power may be crippled in this important branch of its duties. Already have we seen the passage of an act incorporating a railroad company from *74 Norfolk to Weldon most vehemently opposed by a former company established between Petersburg and Roanoke. So the making a railroad from Richmond ^ Lynchburg was warmly opposed by the James River and Kanawha Company, And here we see the Tuckahoe Canal Company insisting that their privileges are invaded by the chartering of the Tuckahoe and James River Railroad Company. If these pretensions are listened to, there will soon be an end of the necessary improvement of the country. But they are without foundation. Monopoly is not a matter of inference.. It must rest its pretensions upon express grant. It is a restriction upon common right, and upon legislative power, and cannot be implied. What then is here insisted on? Is it a monopoly of the ■right to take tolls for the transportation on the canal? If this be all, we cannot gainsay it. The canal is their own property; and property necessarily implies a right in the owner, to the exclusion of all others. Is it a monopoly of the right to the transportation of the Tuckahoe valley? If so, the claim is not admitted. Upon the principles maintained by their own counsel, it is denied. What right, upon those principles, has the legislature to take from the colliers the liberty of transporting their coal by wagons, or in any other mode they may elect? What right to prevent their purchasing from the landowners the necessary ground, and constructing a railroad without a charter? So far as respected the Canal Company, the Railroad Company needed no charter to legalize their operations, if they did not cross the canal. It was only necessary to enable them to condemn the lands of others, and to sue and be sued. They do not derive their right to make such a road for transportation of coals from legislative grant. They would have had that without it, and it could never be affirmed, that a charter to them invaded the previous charter, since, so far as the *75 Canal Company are concerned, a charter would have given them nothing more than they had had before, viz: a right to withdraw their coals from the canal transportation, and to transport them by land for themselves and others, according to their own pleasure and ability.
After the very able and comprehensive investigation of this subject in the case of The Charles River Bridge v. The Warren Bridge, it would be superfluous as well as vain for me to attempt or enforce by any arguments of mine, the principles established by the majority of the court, and sustained with such conspicuous ability by the counsel for The "Warren Bridge. It will suffice for me to refer to that case, and to express my assent to the proposition it establishes, that the incorporation of a company for the construction of a bridge or other improvement, where the public interest is concerned, is not to be construed as conferring exclusive privileges, where none such are expressly given by the charter; and, by consequence, that by charters of this description the legislature is not deprived of the power of granting other charters to other companies, even side by side with the former, and in the same line of travel, provided there is no express restriction upon their power in the first act of incorporation. Every principle of sound policy, indeed, forbids that this should be lightly done; or that it should be done without securing some indemnity to those who suffer under such legislation. But it is not matter of right in the company; it is matter of discretion in the legislature; and hence, it is very clearly no matter for judicial decision. The injury done is not more direct than that which is in various instances occasioned by laws of unquestioned validity. The inns and villages upon every public road fall into dilapidation and ruin, upon the change of the course of travel by the construction of a railroad, and flourishing towns which *76 have risen to wealth and importance on the faith of law, by being made a port of entry, sink into insignificance upon the removal of their custom houses more favoure(j Sp0ts. Yet who doubts the power, though many may doubt the wisdom of the legislature, iu making ill advised changes, which bring ruin upon the enterprising, and misery upon thousands? This sport with human prosperity and happiness, indeed, cannot be too much reprobated; but its corrective is to be found elsewhere, and not here, unless the legislature transcend its power; and we have already seen, that unless exclusive rights are contracted for, the legislative power is without a trammel.
The case before us, however, is unlike any that has heretofore occurred, in one very important particular. The Tuckahoe Railroad Company set up a pretension to run their road across the canal, on a bridge of a certain elevation. They are not content with passing on side by side with their rival, but they assert a right by their charter to cross his line of improvement. This brings us to the inquiry, how far the legislative*power is adequate to the grant of such a right? And here, I imagine, the right of eminent domain, which rides over every other, will be found sufficient for the purpose. It is well observed by my Brother Brooke, in his lucid opinion in the case of Stokes v. Upper Appomattox Company, 3 Leigh 337, on the subject of the jus publicum, that “though our institutions and laws are justly tenacious of private' rights, yet the ruling principle of them is, that where private rights come in conflict with public, the former must yield to the latter; in which event, the legislature alone is competent to make compensation.” It may, indeed, be truly said, that this jus publicum, this eminent domain, is the law of the existence of every sovereignty. It is as vital to it as air to animal life; and hence, it has no limit but the necessities of the body politic, of which *77 that body alone must be the judges. It is absolute over the persons, as well as the property, of its members. It commands the sacrifice of life, as well as the surrender of possessions; and it would be strange, deed, if to that sovereignty which can compel me to lay down my life in its service, the power should be denied of taking my property for its uses. At this time of day, it is too late to set up any barrier to that power. It has been in constant exercise since the existence of society, and must continue unrestricted so long as society shall last. It has been exerted in the establishment of every common road through the country; in the erection of public buildings, the condemnation of land for public improvements, the impressment of property flagrante hello, and in various other modes not necessary to be here stated. In its exercise, however harsh, it never has been deemed to be a violation of individual right, or a breach of contract with the subject, either express or implied. For though the sovereignty has granted its land, or its privileges, without an express reservation of a right to take them for public uses, yet that right is necessarily implied; and even if alienable at all, it is not to be presumed to be surrendered without an express abandonment. As was observed by Chief Justice Marshall of the taxing power, “ The whole community is interested in retaining it undiminished, and that community has a right to insist that its abandonment should not be presumed where the deliberate purpose to abandon does not appear.”
It seems to be supposed, however, that the rights of the Canal Company which are called a franchise, cannot be invaded, though the power to take other private property for public uses may not be denied. It is proper, then, to come to a proper understanding of this word franchise, that we may the better comprehend what is to be regarded as trenching upon it. *78 Now, I take a franchise to be, 1. an incorporeal hereditament, and 2. a privilege or authority vested in certain persons by grant of the sovereign, (with us, ^y gpec^a¡ gtatute) to exercise powers, or to do and perform acts which without such grant they could not do or perform. Thus, it is a franchise to be a corporation, with power to sue and be sued, and to hold property as a corporate body. So it is a franchise to be empowered to build a bridge, or keep a ferry, over a public stream, with a right to demand tolls or ferriage ; or to build a mill upon a public river, and receive tolls for grinding, &c. But the franchise consists in the incorporeal right; the property acquired is not the franchise. A bank has a right to purchase a banking house: when purchased, is the house a franchise? Surely not, for it is corporeal, whereas a franchise is incorporeal. So of a railroad company: it has the franchise to condemn land for its road, which at once becomes vested in the company in absolute property; but the land is not the franchise. It is real property held by the company upon the same implied terms, on which others hold their lands, that it may be taken for public uses upon compensation being made. Indeed, in former days, the eminent domain in the establishment of roads was exercised (as we are reminded by Judge Brooke in the case before cited) without compensation; but it is now very wisely and justly provided by the constitution, that in all cases where private property is taken for public uses, just compensation shall be made to the owner for his loss.
It is not then perceived that the property of a corporation is less liable to the exercise of the jus publicum, than the property of a private individual. In both eases, the private right must yield to the necessities of the public, and in both the public must make compensation for the loss. In the former, indeed, the necessity is more apparent; for were it *79 otherwise, the greatest mischiefs would ensue. The James River Canal running east and west, and the railroads running north and south, might very seriously impede the intercourse between the different parts the state, if the companies have the right to prevent the passage across their line of improvement, and the jus publicum cannot be exercised in the creation of new roads to meet the growing exigencies of the country. A person fifty yards from his mill, or county courthouse, may be driven to the necessity of traveling miles around to reach them, or of submitting to the unreasonable exaction of a monopolist. It would be difficult to make him comprehend, how the legislative power could extend to taking away his land to make the railroad, and could cut him off from his ordinary comforts and conveniences, and yet be inadequate to the exercise of the eminent domain in giving him a right of passage across the line of the improvement thus constructed to his detriment.
Upon the whole, therefore, I think it was competent to the legislature to empower the Railroad Company to cross the line of the canal, whether the Canal Company be regarded as the proprietors of the soil, or of a mere right of way. If they are proprietors of the soil, then they hold it by the same tenure that every man holds his land; that is, subject to the jus publicum. If it is a mere right of way to which they‘have title, the argument applies with yet more force, since the power to condemn the land itself is'greater than that of condemning an easement upon it. In the exercise of this power, however, it must never be forgotten, that a just compensation for rights or property condemned must always be made.
But several questions here present themselves: 1. Is it necessary to the validity of the act, that compensation should be provided before the property can be taken ? The constitution provides, that the legislature *80 shall pass no law whereby private property shall be for public uses without just compensation. And although there is no express requisition that the act invades the right shall provide the indemnity, yet, after much reflection, I incline to the opinion that it should do so. The instances which may occur flagrante hello, of impressments and destruction of property, though at first view they may seem to indicate a different construction, yet are rather to be referred to the necessities which war imposes, when the safety of the state is the supreme law, and justice is silenced by the din of arms.
2. Conceding, as I readily do, that the question of compensation is a judicial question, and that it is not in the power of the legislature to settle it, since this would be to unite judicial and legislative powers, and to enable the government to decide in its own case, it may next be asked, whether an act invading private property will be held to be void, when it clearly appears to the judicial tribunal, that no injury is done, and nothing taken, which will entitle the party to compensation? To this I should answer in the negative; for however proper and prudent it might be to provide for the establishment of that fact by the ordinary proceedings, yet if, upon full investigation before the proper tribunal, no injury should appear, we should be justified, I think, in considering the statute as not in conflict with the spirit of the constitution.
In the present case, however, these questions are unimportant, if it shall appear that by the Railroad charter a method is provided for ascertaining and making compensation for property necessary for the road. Row, this I think clear, by the reference in the charter itself, to the general railroad law, as the law of the company. According to that law, they are bound to proceed to condemn the lands necessary for their road. If the Canal Company are the *81 •owners of the soil where the road passes their line of improvement, the Railroad Company should have it condemned as their property; if they are not the owners of the soil, they should have proceeded condemn the property as Mr. Wickham’s property, have purchased his rights by private contract; and in either case, they would hold subject to the easement of the canal, precisely as he held it. The record does not shew how this matter is, nor is it material to the question we are considering; for the charter having duly provided for compensation, it is not void, although the company may have failed to pursue its provisions. That is a matter to which I shall have occasion presently to refer.
We proceed next to inquire, whether the charter authorizes the Railroad Company to cross the line of the canal. This must be decided by reference to several acts: 1. The charter itself, which fixes one terminus of the road at Mrs. Ellis’s land: the other terminus is declared to be such point on the James River canal as the Railroad Company may select. 2. It then vests in the company the liberty to construct their road subject to the provisions of the general railroad law. 3. By the provisions of that statute, the company have a right to enter upon all lands through which they may desire to conduct their road, and to lay out the same according to their pleasure. By this provision, then, they were invested with unlimited power to locate the road between the two termini as they pleased. If, then, the location so made crossed the canal, the law authorized them to cross it; and we have already seen that such authority was within the competence of the legislature to .give. The only obligations upon the company are to avoid encroaching on the dwelling houses, &c., and to pay for the property taken.
We have, then, it is conceived, established these *82 two points: that the Railroad charter is not unconstitutional, and that it authorizes the company to cross the line of the canal. Upon what terms, is the next qlies^on pe solved ? And here, there is some diffieulty in ascertaining from the record what is the state of the fact. It does not appear whether any proceedings have been instituted by the company, or the proprietor, for the condemnation of the land and the assessment of damages. Certain it is, that the Railroad Company cannot pass the canal, without being responsible to the owner of the land for the damages done by the condemnation. In what manner the Canal Company may be entitled to compensation for any injury they may sustain, and to what extent, it" would be premature in this case to inquire. Satisfied', as I am from the record, that they are not the owners-of the soil, either legally or equitably, and that they have only title to an easement, I have no doubt that the land should be condemned as Mr. Wickham’s. I am also of opinion, that when so condemned,.the title-to the land will vest in the Railroad Company, subject■ to the easement; and that they will be bound, as Mr. Wickham was bound, not to obstruct or impair its enjoyment. Whether it would be practicable for them, if they so desired, to extinguish that easement by any proceeding now known to the law, it is not necessary in the present state of things to inquire. Our only concern is to know, whether they have undertaken to ■ exercise their right of passing the canal prematurely.. It seemed to be considered by the counsel, that the condemnation must precede the execution of the work.. This is, I conceive, a misconception of the law. The company have a right to proceed with their work before condemnation; and, indeed, there is no absolute obligation on them, to institute the process for assessing the damages to the land, since in case of their default the owner himself may do so. It is,, therefore,, *83 clear that the work is not to be suspended until the damages are assessed and paid; and this is rendered more undeniable by the 13th section, which in connexion with the previous sections, provides, that the mean time” (that is, while the process of valuation . . ... . . .. ....... or assessment is going on) “no injunction shall be awarded to stay the proceedings of the company in the prosecution of their works, unless &c.” It was then necessary, that the damages should have been assessed and paid before the company proceeded to. the erection of their bridges.
"With these views of the law of this ease, I cannot perceive that the Railroad Company have, in any respect, “transcended the authority given by the law,”' in proceeding to erect their bridges over the line of' the canal. Nor can I perceive, that they have done,, or are about to do, any injury to the Canal Company which cannot be adequately compensated in damages. On the contrary, it is palpable, that (apart from the competition, which we have already shewn the Canal Company cannot complain of) there is no injury done them whatever. The railroad bridges are much higher above the water than their own bridges. Every load which can pass the canal bridges will be wholly unobstructed by the railroad bridges, while boats that can pass the latter would be obstructed by the former. It is, therefore, not true that any injury whatever, and much less an irreparable injury, has been done, or is likely to ensue. The interference by injunction was, therefore, improvident, and in direct conflict with the statute, and with the established principles of a Court of Equity. I am, therefore, of opinion, wholly to dissolve it, and to dismiss the bill. It will be at its own peril if the Railroad Company so erects its bridges as to obstruct or impede the easement of the canal. It has not yet done so. When it does, it will be time enough to invoke the extraordinary powers of a Court *84 of Equity, by shewing the danger of actual and irreparable injury. It will then also be time enough to decide how far the Canal Company have power to ex-^en(j easement, either laterally, or by raising their bridges, and removing as a nuisance that which is erected by the Railroad Company. Those inquiries, at this time, appear unnecessary and premature.
According to this opinion, the decree of the Circuit Superior Court was right in dissolving the injunction, but erroneous in imposing the restriction as to the height of the bridges. It ought to have been wholly dissolved, as improvidently awarded.
The other judges concurred.
Decree, that the Circuit Superior Court ought TO HAVE DISSOLVED THE INJUNCTION AS IMPROVIDENTLY AWARDED, WITHOUT IMPOSING ANY RESTRICTION AS TO THE HEIGHT OF THE FRIDGES, AND THAT THE SAID ORDER IS ERRONEOUS.