**Opinions of the United States Court of Appeals for the Third Circuit**



1-17-1997

# Al Tech Spec Steel v. Algheny Intl Credit

Precedential or Non-Precedential:

Docket 95-3415

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

## Recommended Citation

"Al Tech Spec Steel v. Algheny Intl Credit" (1997). *1997 Decisions.* Paper 16.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/16

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95–3415
_____

AL TECH SPECIALTY STEEL CORPORATION,
Appellant

v.

ALLEGHENY INTERNATIONAL CREDIT CORPORATION;
SUNBEAM CORPORATION; SUNBEAM HOLDINGS, INC.,
ALMET/LAWNLITE, INC; CHEMETRON CORPORATION;
INTERGRATED SPECIALTIES, INC.;
ALLEGHENY INTERNATIONAL (USA), INC.;
AL INDUSTRIAL PRODUCTS, INC.;
ALLEGHENY INTERNATIONAL EXERCISE, CO.;
WOODSHAFT, INC.; CHEMETRON INVESTMENTS, INC.,
INFOWSITCH, INC.; ELISKIM, INC.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 93–01445)
_____

Argued:  May 6, 1996
Before:  GREENBERG, ALITO, and MCKEE, Circuit Judges:

(Opinion Filed: January 17, 1997 )
_____

David P. Flynn, Esq.
Kevin M. Hogan, Esq. (Argued)
Phillips, Lytle, Hitchcock,
Blaine & Huber
3400 Marine Midland Center
Buffalo, New York 14203

Attorneys for Appellant

William L. Gardner, Esq.
Anthony C. Roth, Esq. (Argued)
Morgan, Lewis & Bockius LLP
1800 M Street, N.W.
Washington, D.C. 20036

Attorneys for Appellee

ALITO, Circuit Judge:

This is an appeal from a district court order affirming the bankruptcy court's disallowance of AL Tech Specialty Steel Corporation's ("AL Tech") claim against Allegheny International, Inc. ("Allegheny International") in Allegheny International's Chapter 11 proceeding. AL Tech's claim was based on certain environmental liabilities, under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the New York Oil Spill Act, at two steel plants that it purchased from Allegheny International's corporate predecessor in 1976. The bankruptcy court held that AL Tech's claim was not barred by either § 502(c) or § 502(e)(1)(B) of the Bankruptcy Code, 11 U.S.C. §§ 502(c),(e)(1)(B), and it estimated the total remediation cost at the two plants for which Allegheny International might share responsibility at $12,792,000. The bankruptcy court also ruled that Allegheny International's equitable share of AL Tech's federal liabilities was zero, primarily because of a dollar-for-dollar discount taken off the purchase price by the current owner of AL Tech's stock in 1989. It further held that the New York statute created a private right of action but that any action that AL Tech could bring against Allegheny International under the New York statute was time-

barred. The district court affirmed the bankruptcy court's order in all respects.

We conclude that there was insufficient evidence before the bankruptcy court to support the finding of a dollar-for-dollar discount in the 1989 purchase of AL Tech by its current corporate parent and that any discount that may have been given accrued to the benefit of AL Tech's parent and not to AL Tech. We therefore reverse the order of the district court as it relates to Allegheny International's equitable share of AL Tech's federal environmental liabilities. We also conclude that the bankruptcy court applied the wrong limitations period in assessing the portion of AL Tech's claim that relied on the New York statute. However, in light of a 1995 decision by the New York Court of Appeals on the availability of a private right of action under the New York statute, we remand that issue for application of the holding of that decision to the present case. We affirm the order of the district court as it relates to §§ 502(c) and 502(e)(1)(B) and the bankruptcy court's estimation of remediation costs to be allocated between AL Tech and Allegheny International.

I.

The factual and procedural history of this case may be summarized as follows. AL Tech bought two steel plants in Dunkirk and Watervliet, New York, from Allegheny International's predecessor, Allegheny Ludlum Industries ("Allegheny Ludlum"), in 1976. (Allegheny Ludlum had owned and operated the plants since 1937.) Since then, AL Tech's stock has been sold three times: in

3

1981, to GATX Corporation; in 1986, to Rio Algom, Inc. and Rio Algom Limited (collectively "Rio Algom"); and most recently (in 1989) to Sammi Steel Company, Limited ("Sammi"). Environmental assessments of the two plants performed in the mid- and late 1980s revealed numerous areas of contamination with oil, polychlorinated biphenyls ("PCBs"), and other hazardous substances that would require costly remediation in order to come into compliance with applicable environmental statutes and regulations.

After Allegheny International filed a bankruptcy petition in 1988, AL Tech filed a timely proof of claim, alleging that Allegheny International was liable for a share of the incurred, contingent, and unliquidated response costs required to remediate the contamination at the two plants. The bankruptcy court initially denied the claim, but its decision was reversed by the district court, In re Allegheny Int'l, Inc., 126 B.R. 919 (W.D. Pa. 1991), and a panel of this court affirmed by judgment order, Allegheny Int'l, Inc. v. AL Tech Specialty Steel Corp., 950 F.2d 721 (3d Cir. 1991) (table). The case was remanded to the bankruptcy court for a trial to allow for estimation and allocation of AL Tech's claim.

On the basis of evidence presented at that 1992 trial, the bankruptcy court (1) estimated the allowable liabilities at $12,792,000, (2) found that Sammi had received a $22 million discount (3) held, primarily for that reason, that Allegheny International's equitable share of the cleanup costs was zero, and (4) held that AL Tech's Oil Spill Act claim was time-barred

4

by the applicable limitations period.  In re Allegheny Int'l, Inc., 158 B.R. 361 (Bankr. W.D. Pa. 1993).  The district court affirmed the bankruptcy court's order in its entirety.  AL Tech Specialty Steel Corp. v. Allegheny Int'l, Inc., No. 93-1445 (W.D. Pa. June 27, 1995).  This appeal followed.

On appeal, AL Tech argues that there was no discount; that if there was one, it was received by Sammi, not AL Tech; that the bankruptcy court abused its discretion in focusing on only one equitable factor when it concluded that Allegheny International's equitable share was zero; that the bankruptcy court erred in finding that AL Tech failed to prove that Allegheny International was responsible for any of the PCB contamination at one of the contaminated sites, Willowbrook Pond; that the bankruptcy court underestimated response costs at Willowbrook Pond (at $1.3 million, versus AL Tech's estimate of approximately $14 million); and that the bankruptcy court applied the wrong limitations period and used the wrong triggering event in holding AL Tech's Oil Spill Act claim to be time-barred.

Allegheny International disagrees on every point and raises two independent grounds for affirming the district court: first, that AL Tech's claim is barred by Bankruptcy Code § 502(e)(1)(B) because it is a contingent co-liability to the government, rather than a direct claim against Allegheny International; and second, that it should be disallowed pursuant to Bankruptcy Code § 502(c) because AL Tech has not taken sufficient steps to remove the contingencies (i.e., has not done enough to assess and clean up the contamination since 1976).  We

5

address Allegheny International's arguments first and then turn to AL Tech's arguments.

## II.

Section 502(e)(1)(B) of the Bankruptcy Code provides:

(e)(1) . . . [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured, the claim of a creditor, to the extent that --

. . .

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.

11 U.S.C. §§ 502(e)(1), (e)(1)(B).

Allegheny International argues that § 502(e)(1)(B) bars AL Tech's claim. The bankruptcy court originally agreed with Allegheny International, but in its 1991 decision, the district court held that this section barred only contingent claims on which the claimant and the debtor are co-liable to a third party and that to the extent that AL Tech's claim against Allegheny International was based on CERCLA, 42 U.S.C. §§ 9601 et seq.,[1] it was not excluded because it was a direct claim against Allegheny International. 126 B.R. at 923-24. This court affirmed the district court's order by judgment order. 950 F.2d 721 (3d Cir. 1991)(table). On remand, the bankruptcy court considered itself bound by the district court's 1991 decision under the "law of the

_____

1. The parties did not brief the applicability of § 502(e)(1)(B) to AL Tech's Oil Spill Act claim in the earlier appeal to the district court. In the present appeal, Allegheny International has again focused its arguments on the applicability of § 502(e)(1)(B) to CERCLA claims, leaving the Oil Spill Act claim virtually unaddressed. We thus read Allegheny International's argument as limited to AL Tech's CERCLA claim.

6

case" doctrine, and it thus declined Allegheny International's invitation to revisit the issue in light of two 1992 bankruptcy court decisions, In re Cottonwood Canyon Land Co., 146 B.R. 992 (Bankr. D. Colo. 1992), and In re Eagle-Picher Indus., Inc., 144 B.R. 765 (Bankr. S.D. Ohio 1992), aff'd, 164 B.R. 265 (S.D. Ohio 1994). 158 B.R. at 367.

In this appeal, Allegheny International urges us to reexamine the question whether AL Tech's claim is barred by § 502(e)(1)(B), but under the law of the case doctrine, we believe that it would be inappropriate for us to do so. Under the law of the case doctrine, an appellate court should generally decline to reconsider a question that was decided in a prior appeal. See 18 Charles A. Wright, et al., Federal Practice and Procedure § 4478, at 788 (1981 & 1996 Supp.). "The doctrine is not a jurisdictional limitation; rather, it `merely expresses the practice of courts generally to refuse to reopen what has been decided.'" Alliance for Cannabis Therapeutics v. DEA, 15 F.3d 1131, 1134 (D.C. Cir. 1994) (quoting Messenger v. Anderson, 225 U.S. 436, 444 (1912)). Accordingly, it is appropriate for an appellate court to reconsider a decision made in an earlier appeal in exceptional circumstances, such as where there has been an intervening change in the law, where new evidence has become available, or where reconsideration is necessary to prevent clear error or a manifest injustice. 18 Charles A. Wright, et al., supra, § 4478, at 790.

In this case, the panel that heard the prior appeal necessarily decided that AL Tech's claim was not barred by §

502(e)(1)(B).  The law of the case doctrine applies to this decision even though it was rendered by judgment order because that doctrine "applies both to issues expressly decided by a court in prior rulings and to issues decided by necessary implication."  Bolden v. SEPTA, 21 F.3d 29, 31 (3d Cir. 1994); see also United States v. Local 560 (I.B.T.), 974 F.2d 315, 329–30 (3d Cir. 1992) (applying doctrine to judgment order).

Moreover, we do not believe that there are exceptional circumstances here that make it appropriate to reconsider the prior panel's decision.  While Allegheny International points to two intervening bankruptcy court decisions that disagree with the district court's decision in this case, those decisions do not represent the type of authority necessary to invoke the exception that applies when there has been an intervening change in the law.  Nor do those decisions convince us that a refusal to reconsider the issue would amount to clear error or a manifest injustice.

We likewise reject Allegheny International's argument that this court's opinion in In re Penn Cent. Transp. Co., 944 F.2d 164 (3d Cir. 1991), cert. denied, 503 U.S. 906 (1992), represents an intervening change in the law sufficient to relax the usual strictures of the law of the case doctrine.  There are two problems with Allegheny International's argument.  First, while the decision in Penn Central came after the district court's 1991 decision, it was handed down more than two months before the filing of judgment order by which this court affirmed the district court's order.  Second, the Penn Central decision

8

did not directly address the issue at hand but rather concerned the government's ability to assert CERCLA claims against a reorganized debtor where the consummation order, which protected the reorganized debtor against lawsuits based on the debtor's activities, predated the enactment of CERCLA. Accordingly, we believe that it is inappropriate in this case to reconsider the merits of Allegheny International's § 502(e)(1)(B) argument.

Allegheny International also argues that § 502(c) of the Bankruptcy Code precludes estimation of AL Tech's claim because AL Tech has not taken sufficient steps to remove the contingencies in its claim, i.e., has not done enough to assess and remediate the various contamination problems at its plants. We agree with the district court that this argument must fail. The cases that Allegheny International cites do not support its position. All three cases, Kessler v. Jefferson Storage Corp., 125 F.2d 108 (6th Cir. 1941), In re Hot Springs Broadcasting, Inc., 210 F. Supp. 533 (W.D. Ark. 1962), and In re KDI Corp., 119 B.R. 594 (Bankr. S.D. Ohio 1990), concern § 57(d) of the Bankruptcy Act of 1898, which provided that unliquidated claims were not to be allowed where liquidation would unduly delay the administration of the estate. Thus, a claimant had the burden of liquidating its claim as a condition precedent to its allowance. By contrast, § 502(c) of the Bankruptcy Code specifically provides for estimation, for purposes of allowance, of such unliquidated claims. The three cases are also factually distinguishable from the present case; for instance, the claimant in KDI Corp. was denied permission to amend a claim filed 12

9

years earlier, after it had waited eight years before even seeking permission to amend. As the bankruptcy court noted, the law does not require that all contingencies be removed, and AL Tech has taken some steps to remove the contingencies in its claim.

III.

AL Tech's principal arguments on appeal concern the bankruptcy court's determination of Allegheny International's equitable share of AL Tech's allowable CERCLA liabilities. After estimating AL Tech's response costs to total $12,792,000, the bankruptcy court proceeded to determine Allegheny International's equitable share of those costs pursuant to § 113(f) of CERCLA, which authorizes a court to allocate response costs among responsible parties "using such equitable factors as [it] determines are appropriate." 42 U.S.C. § 9613(f). The court considered a number of factors, but its ultimate conclusion –– that Allegheny International's equitable share was zero –– was based on its findings that Sammi was fully aware of AL Tech's future environmental liabilities and that, as a result, Sammi "discounted the purchase price dollar for dollar until the total purchase price was $1.00" and thus "held no real expectation that [Allegheny International] would pay for any portion of the remediation costs." 158 B.R. at 383. AL Tech argues that there is no record evidence, let alone sufficient evidence, to support such findings and that, even if there were such a discount, the beneficiary of that discount was not AL Tech, the claimant in this case, but Sammi.

10

With respect to this issue, the following facts are undisputed or at least beyond dispute under a clearly erroneous standard. Sammi was aware of $22 million in environmental liabilities on the part of AL Tech when it purchased AL Tech's stock in 1989. An agreement among Rio Algom, Sammi, and AL Tech provided for an adjustment to the purchase price in the event of changes in AL Tech's net worth. At the time of the sale, AL Tech and Sammi "accrued" $22 million in expenses to cover future environmental liabilities; these were charged against sales during the first seven months of 1989. This substantially reduced the net worth of AL Tech,[2] and after litigation and arbitration over the propriety of this accounting procedure, Rio Algom was required to pay Sammi in excess of $5 million to assume ownership of AL Tech.[3] Of this amount, $2.4 million was awarded to Sammi to account for the increased environmental liabilities.

AL Tech argues that there was insufficient evidence to show that Sammi reduced the sale price dollar for dollar to account for the $22 million in liabilities of which it was aware at the time of the transaction. Allegheny International relies on the testimony of two officers of AL Tech: Ronald Hansen, the chief financial officer, and James Mintun, the chief executive officer. Both Hansen and Mintun testified that the environmental

2. AL Tech points out that the net worth of its stock on the date of purchase was approximately negative $16 million. A. 1515. Thus, it argues, even considering the subsequent adjustment in the purchase price, Sammi overpaid for AL Tech's stock by some $11 million.

3. The parties cite a figure of $5.3 million, while the bankruptcy court quoted the figure of $6.5 million.

11

liabilities reduced AL Tech's value and reduced the purchase price, A. 301, 303, 325-27, and Hansen testified that these liabilities brought the purchase price down "[a]pproximately dollar for dollar." A. 327. However, Hansen also testified that he had "absolutely no idea whatsoever how [the purchase price] was arrived at," A. 335, and had not come to know the reason for the one dollar purchase price, A. 322, and Mintun likewise testified that he had no knowledge of how the price was arrived at. A. 398. Mintun also testified that neither he nor Hansen participated in any of the discussions concerning the price to be paid for AL Tech, A. 398-99, and Hansen testified that he had no involvement in determining what the purchase price would be. A. 323; see also A. 335 (Hansen testifying that he "[did] not know specifically what Sammi paid in fact for AL Tech or what was going through their mind and how they arrived at that").

Also of some relevance is the fact that the agreement for the sale of AL Tech to Sammi makes reference to the proof of claim that AL tech had filed against Allegheny International. A. 1415.[4] Allegheny International points out that this claim was

_____

4. In a reference to possible recoupment from GATX, the notes accompanying AL Tech's financial statements also refer to its management's belief that:

> part of [the $22 million] environmental liability may be recovered through negotiations or litigation with certain of the Company's previous owners. Because of the uncertainty, no recognition has been given to a recovery of these liabilities in the accompanying financial statements.

A. 1582.

12

not identified as an asset on AL Tech's balance sheets.  In addition, the schedule of the sale agreement in which it appears seems designed to disclose pending or threatened litigation that might result in judgments against AL Tech.  See A. 1331.  Still, on the basis of the sale agreement, it is clear that Sammi was aware of the existence of AL Tech's claim against Allegheny International.

A reduction in the purchase price of a facility is certainly a valid factor to be considered in allocating CERCLA response costs among responsible parties, see, e.g., Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 90 (3d Cir. 1988), cert. denied, 488 U.S. 1029 (1989), and the amount of the discount is, of course, important, id.  On the record before the bankruptcy court, however, we do not think that there was sufficient evidence to support a finding that the discount received by Sammi equalled $22 million.  The testimony of Hansen and Mintun reflects, at best, informed speculation as to the existence and magnitude of any discount in the price paid by Sammi for AL Tech's stock.

An even more fundamental issue raised by AL Tech is whether any discount received by Sammi in its purchase of AL Tech from Rio Algom should be reflected in a dispute that involves neither Sammi nor Rio Algom, but rather AL Tech and Allegheny International.  AL Tech point out that Smith Land and all of the other cases cited by Allegheny International and the bankruptcy court -- Amoco Oil Co. v. Borden, Inc., 889 F.2d 664 (5th Cir. 1989); BTR Dunlop, Inc. v. Rockwell Int'l Corp., 1992 WL 159203

(N.D. Ill. June 29, 1992); South Fla. Water Management Dist. v. Montalvo, 1989 WL 260215 (S.D. Fla. Feb. 15, 1989); and Southland Corp. v. Ashland Oil, Inc., 696 F. Supp. 994 (D.N.J.), modified on reconsideration, 1988 WL 125855 (D.N.J. Nov. 23, 1988) -- involved allocation between the seller and the purchaser of the subject property (or their successors, see Smith Land, 851 F.2d at 88). Here, the seller (Rio Algom) is not in the picture; Allegheny International's predecessor received full value for the plants when it sold them to AL Tech in 1976 for $23.5 million in cash and stock. A. 647-702 (purchase agreement). In addition, AL Tech, not Sammi, is the claimant here, and under traditional corporate law principles the two companies are considered separate entities. Thus, even if it is assumed that there was a discount in the 1986 sale, this discount would work against Sammi and in favor of Rio Algom, but it does not necessarily work against AL Tech and in favor of Allegheny International.

Allegheny International's counterargument is that the bankruptcy court properly disregarded corporate forms in light of AL Tech's status as a wholly-owned subsidiary of Sammi. Allegheny International cites several cases describing bankruptcy courts as courts of equity that will disregard legal fictions when justice requires. The problem here is that the bankruptcy court did not find that justice required that it regard Sammi and AL Tech as a single entity. In the absence of such a finding, it was error to assume, as the bankruptcy court appears to have done, that any windfall reaped by Sammi should be imputed to AL Tech.

14

Nor do we believe, on the record before us, that such a finding would be warranted. Allegheny International has pointed to no facts that would allow the piercing of the corporate veil. Without sufficient facts of record to warrant veil-piercing, i.e., facts of sufficient dominance of the affairs of the subsidiary by the parent corporation, AL Tech and Sammi must be considered separate entities. See In re Cohn, 54 F.3d 1108, 1116-17 (3d Cir. 1995); see also Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 643 (3d Cir. 1991) ("[T]here is a presumption that a corporation, even when it is a wholly owned subsidiary of another, is a separate entity."), cert. denied, 503 U.S. 937 (1992).

AL Tech also argues that the bankruptcy court abused its discretion in relying exclusively on a single equitable factor -- the discount received by Sammi -- in deciding that Allegheny International's equitable share of the cleanup cost was zero. It is within the court's discretion to rely on a single factor, see Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 509 (7th Cir. 1992), but here the court also considered several other factors, e.g., actual years of ownership and operation of the two plants, 158 B.R. at 383, Allegheny Ludlum's compliance with federal environmental laws that were in effect before it sold the plants to AL Tech, id. at 384, and AL Tech's less-than-enthusiastic cleanup efforts since the sale, id. However, it is clear to us that the bankruptcy court's ultimate conclusion can be justified only on the basis of the discount, as the bankruptcy court itself seemed to recognize. See id. at 383

15

("[T]his court considers the discounted purchase price for the AL Tech steel plants to be the most compelling and dispositive allocation factor in this case."). Other factors may weigh in Allegheny International's favor, but they are insufficient to drive Allegheny International's equitable share down to zero. In other words, it was inconsistent with the sound exercise of its discretion for the bankruptcy court to rely, not simply on a single factor, but on a single factor where the factual finding underlying the factor was clearly erroneous.

AL Tech raises two arguments with respect to Willowbrook Pond, a cooling pond at the Dunkirk plant that is contaminated with PCBs.[5] First, AL Tech argues that the bankruptcy court erred in concluding that it failed to prove, by a preponderance of the evidence, that Allegheny International (as successor to Allegheny Ludlum) is responsible for any of the PCB contamination. Second, AL Tech argues that the bankruptcy court committed reversible error in choosing Allegheny International's estimate of the response costs at Willowbrook Pond ($1.3 million) instead of AL Tech's estimate (approximately $14 million).

We find no fault in the bankruptcy court's determination on the liability question here. AL Tech presented no reports, analyses, or other documentation of the use of PCB-containing materials at the plants during the period when the plants were owned by Allegheny Ludlum. AL Tech's evidence

_____

5. The sediments in the pond also contain high levels of nickel, but the dispute here concerns responsibility for, and remediation of, the PCB problem.

consisted of the testimony of Edwin Diehl and Morton Parker, neither of whom could establish that the materials used by Allegheny International before the purchase of the plants by AL Tech contained PCBs. Mr. Diehl, AL Tech's Director of Engineering (and previously its Director of Environmental Affairs), pointed to a hydraulic fluid, first used in new rolling mill machinery in 1970, as the source of the PCBs in Willowbrook Pond. A. 437-40, 454, 457. He had no personal knowledge, however, as to whether the fluid contained PCBs.

Mr. Parker visited the Dunkirk plant in the mid-1970s to determine whether oils and greases that Allegheny Ludlum had collected from Willowbrook Pond were suitable for reclamation by his employer, Wallover Oil Company. A. 465-69. He testified that Allegheny Ludlum had recently switched to a new hydraulic fluid that did not contain PCBs, that the fluid previously used sank because it was heavier than water, and that fluids that contained PCBs also were heavier than water and sank. A. 467-69. Mr. Parker also testified that his company rejected Allegheny Ludlum's oils and greases for reclamation and that, while PCB contamination was the reason for most such rejections, he did not recall the reason for rejecting Allegheny Ludlum's materials. A. 470-72. Mr. Parker also could not recall the results of any chemical analyses done on the materials from Willowbrook Pond. A. 470. Nor could he recall the year in which he visited the plant or the name of anyone whom he met there. A. 466. Like Mr. Diehl, then, Mr. Parker could provide no specific information as

17

to whether any materials used by Allegheny Ludlum before the 1976 sale of the plants to AL Tech contained PCBs.

It may well be that Allegheny Ludlum used PCB-containing materials during the relevant period, and it may be that the only reasonable explanation for the presence of PCBs in the pond sediments, based on the evidence adduced, is that Allegheny Ludlum dumped them there. But that is different from proving, by a preponderance of the evidence, that Allegheny International is responsible for at least some of the contamination. This AL Tech failed to do. In light of this conclusion, it is not necessary to reach AL Tech's second argument regarding Willowbrook Pond.

IV.

We deal last with two related questions concerning AL Tech's claim under the New York Oil Spill Act, N.Y. Nav. Law §§ 171-197 (McKinney 1989 & Supp. 1996). First, may AL Tech bring an action against Allegheny International under the Oil Spill Act? Second, is any such action time-barred? Because our decision concerning these questions of New York law is unlikely to have much precedential significance, we will deal with them in an abbreviated fashion.

A. Under White v. Long, 650 N.E.2d 836 (N.Y. 1995), a case not considered by either the bankruptcy court or the district court, it is clear that a property owner may under certain conditions sue a prior owner to recover cleanup costs. The claim in White was asserted under § 181(5), which provides as follows:

18

Any claim by any injured person for the costs of cleanup and removal and direct and indirect damages based on the strict liability imposed by this section may be brought directly against the person who has discharged the petroleum, provided, however, that damages recoverable by any injured person in such a direct claim based on the strict liability imposed by this section shall be limited to the damages authorized by this section.

N.Y. Nav. Law § 181(5) (McKinney Supp. 1996).

Another provision of the Act defines a "claim" as "any claim by an injured person, <u>who is not responsible for the discharge</u>." N.Y. Nav. Law § 172(3) (McKinney Supp. 1996) (emphasis added). Noting this definition, the New York Court of Appeals wrote in <u>White</u>:

Although even faultless owners of contaminated lands have been deemed "dischargers" for purposes of their own section 181(1) liability,[6] where they have not caused or contributed to (and thus are not "responsible for") the discharge, they should not be precluded from suing those who have actually caused or contributed to such damage. To preclude reimbursement in that situation would significantly diminish the reach of section 181(5).

650 N.E.2d at 838 (footnote added).

Since neither the bankruptcy court nor the district court has applied <u>White</u> to the facts of this case, we remand AL Tech's Oil Spill Act claim so that this can be done.[7]

6. This provision states in pertinent part that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained, as defined in this section." N.Y. Nav. Law § 181(1)(McKinney Supp. 1996).

7. AL Tech originally argued that its claim arose under N.Y. Nav. Law § 176(8), which provides:

19

B. On the issue of the statute of limitations, under the New York Court of Appeals' decision in State v. Stewart's Ice Cream, Inc., 473 N.E.2d 1184 (N.Y. 1984), it appears that AL Tech's claim is governed by the six-year limitations period for actions on express or implied contracts, N.Y. Civ. Prac. L. & R. § 213(2) (McKinney 1990). In Stewart's Ice Cream, the state paid for the cleanup and removal of discharged petroleum and then sought to recover its expenses from the party that caused the discharge. The New York Court of Appeals concluded that the state's claim was one for indemnity and that liability on an indemnity claim "theoretically springs from an implied contract." Id. at 1186. The court further held that the state's claim was not covered by the three-year limitations period for actions to recover on a liability created or imposed by a statute, N.Y. Civ. Prac. L. & R. § 214(2) (McKinney 1990), because that provision

(..continued)

Notwithstanding any other provision to the contrary . . . every person providing cleanup, removal of discharge of petroleum or relocation of persons pursuant to this section shall be entitled to contribution from any other responsible party.

AL Tech now argues that its claim arises "under both Section 176(8) and Section 181(5)," see Appellant's Br. at 46 n.22, and that White v. Long, supra, which was based on § 181(5), "settled definitively" its right to bring a private action. Appellant's Br. at 44 n.20. AL Tech does not argue that there is any difference between the right of action created by § 181(5) and the right of action that it has asserted under § 176(8). We therefore do not decide whether there is an independent private right of action under § 176(8) or whether any such action differs in scope from the right of action under § 181(5). On remand, the bankruptcy and district courts need only apply White to the facts of this case.

20

applies only to liability not recognized in the common or decisional law and because it could not be said that the state's claim "would not exist but for the statute." Stewart's Ice Cream, 473 N.E.2d at 1187.

In this case, AL Tech's claim appears to be in the nature of a claim for indemnity. Stewart's Ice Cream is arguably distinguishable on the ground that there the court held that the Oil Spill Act did not "expressly provide for an indemnity action such as [the one brought by the state]," 473 N.E.2d 1186, whereas here § 181(5) does expressly provide for AL Tech's claim. However, Stewart's Ice Cream made this point to refute the argument that N.Y. Civ. Prac. L. & R. § 214(2) furnished the applicable statute of limitations. Since Allegheny International does not contend this provision applies here, this arguable distinction need not concern us.[8] Thus, we hold that Stewart's Ice Cream governs here. See 145 Kisco Ave. Corp. v. Dufner Enters., Inc., 604 N.Y.S.2d 963 (App. Div. 1993).

---

8. Moreover, while § 181(5) expressly authorizes Al Tech's claim, the right of indemnity also has roots in common law, although it is also sometimes imposed by statute. See 23 N.Y. Jur. 2d Contribution, Indemnity, and Subrogation § 2 (1982).
   The conclusions reached above also follow if AL Tech's claim is characterized as one for contribution rather than indemnity. It appears well settled under New York law that contribution, like indemnity, is based on an implied contract. Hard v. Mingle, 99 N.E. 542, 544 (N.Y. 1912); Blum v. Good Humor Corp., 394 N.Y.S.2d 894, 896 (App. Div. 1977). Furthermore, contribution existed at common law. Mingle, 99 N.E. 542. Consequently, the six-year limitations period for actions on contracts would apply. Blum, 394 N.Y.S.2d at 896; Liberty Mut. Ins. Co. v. Société Coiffure, Inc., 50 N.Y.S.2d 40, 41 (Sup. Ct. N.Y. Cty. 1944).

We reject Allegheny International's argument that AL Tech's claim is subject to the three-year statute of limitations for actions to recover for damages or injuries to property.  See N.Y. Civ. Prac. L. & R. § 214(4) (McKinney 1990).  The cases upon which Allegheny International principally relies[9] -- State v. King Serv., Inc., 563 N.Y.S.2d 331 (App. Div. 1990), and Town of Guilderland v. Texaco Ref. & Mktg., Inc., 552 N.Y.S.2d 704 (App. Div. 1990) -- involved claims that differ from those asserted by AL Tech.  The claim in Town of Guilderland was explicitly for property damage, viz., damage to the town's sewer system that resulted from an explosion of fumes from gasoline that had leaked into the sewers, rather than one for reimbursement of cleanup costs.  The claim at issue in King Service was also one for direct damages under § 190 of the Act, which covers actions against insurers.  See N.Y. Nav. Law § 190 (McKinney 1989).  On balance, we believe that Stewart's Ice Cream is a closer fit in this case than the decisions on which Allegheny International relies.  We thus hold that the statute of limitation for AL Tech's Oil Spill Act claim is six years.

---

9.  Allegheny also cites two additional cases that are of limited relevance to the present appeal: Victorson v. Bock Laundry Mach. Co., 335 N.E.2d 275 (N.Y. 1975), which applied the three-year limitations periods for actions for property damage and personal injury to cases based on strict product liability; and P.B.N. Assocs. v. Xerox Corp., 529 N.Y.S.2d 877 (App. Div. 1988), order modified on reargument, 575 N.Y.S.2d 451 (App. Div. 1991), which applied the three-year limitations period for actions for property damage to an action for waste stemming from an oil spill.  Neither case involved the Oil Spill Act or an action for indemnity or contribution.

22

Furthermore, it is settled law in New York that an action for indemnity or contribution does not generally accrue until the payment is made by the party seeking recovery. Bay Ridge Air Rights, Inc. v. State, 375 N.E.2d 29 (N.Y. 1978). AL Tech may thus seek to recover cleanup costs under the Oil Spill Act that it incurred within six years prior to its filing of its proof of claim against Allegheny International. To the extent that AL Tech is seeking to recover for future remediation costs,[10] the limitations period has not yet begun.[11]

## V.

For the reasons stated above, we reverse the order of the district court as it relates to the bankruptcy court's finding of a discount in the price paid by Sammi in 1989 and as it relates to the bankruptcy court's determination of Allegheny International's equitable share of AL Tech's allowable response costs, and we remand for reconsideration of equitable allocation without the discount. We reverse the order of the district court as it relates to the limitations period applicable to AL Tech's

10. The bankruptcy court appears to have allowed only those costs related to future remediation efforts.

11. The bankruptcy court disallowed as time-barred only AL Tech's claim related to the Oil Contamination Area. 158 B.R. at 377-78. However, AL Tech's claims related to three other areas -- the Pump House and Aboveground Fuel Tank, the Underground Fuel Tanks, and the Kromma Kill -- are also based on petroleum contamination. 158 B.R. at 368. Given CERCLA's petroleum exclusion, see 42 U.S.C. § 9601(14), the Oil Spill Act may be the only basis for liability at those locations. We thus point out that our conclusion concerning the applicable limitations period applies to any of AL Tech's claims involving petroleum contamination.

claim under the New York Oil Spill Act, and we remand for application of the standard set out in the New York Court of Appeals' decision in White v. Long to the facts of this case.  We affirm the order of the district court as it relates to the bankruptcy court's determination that Bankruptcy Code §§ 502(c) and 502(e)(1)(B) do not bar AL Tech's claim and as it relates to the bankruptcy court's determination that AL Tech failed to prove that Allegheny International was responsible for any of the cleanup costs at Willowbrook Pond.